626 A.2d 1162

Andrew COLLINS, Individually and on Behalf
of a Class of All Those Similarly Situated

v.

ALLSTATE INDEMNITY COMPANY, Appellant.

Albert COOPERSMITH, Individually and on Behalf
of a Class of All Those Similarly Situated

v.

COLONIAL PENN INSURANCE COMPANY, Appellant.

Lucinda CONYERS, Individually and on Behalf
of a Class of All Those Similarly Situated

v.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, Appellant.

Clayre ABRAMSON, Individually and on Behalf
of a Class of All Those Similar Situated

v.

LIBERTY MUTUAL INSURANCE COMPANY, Appellant.

Albert COOPERSMITH, Ind. and on Behalf of
a Class of All Those Similarly Situated

v.

COLONIAL PENN INSURANCE COMPANY, Appellant.

Lucinda CONYERS, Individually and on Behalf
of a Class of All Those Similarly Situated

v.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, Appellant.

Jean PERSON, Administratrix of the Estate of Andrew
Collins, Individually and on Behalf of a Class of
All Those Similarly Situated, Appellant,

v.

ALLSTATE INSURANCE COMPANY.

Clayre ABRAMSON, Individually and on Behalf
of a Class of All Those Similar Situated

v.

LIBERTY MUTUAL INSURANCE COMPANY, Appellant.

198

Ann BYRNE and Jane Nole, Executrices of the Estate
of Ann Alkins, Individually and on Behalf of a
Class of All Those Similarly Situated

v.

SOUTHEASTERN PENNSYLVANIA TRANSPORTATION
AUTHORITY, Appellant.

Ann BYRNE and Jane Nole, Executrices of the Estate
of Ann Alkins, Individually and on Behalf of a
Class of All Those Similarly Situated

v.

SOUTHEASTERN PENNSYLVANIA TRANSPORTATION
AUTHORITY, Appellant.

Elizabeth TUCKER, Ind. and on Behalf of
Class of All Those Similarly Situated

v.

NATIONWIDE MUTUAL INSURANCE COMPANY, Appellant.

Elizabeth TUCKER, Ind. and on Behalf of Class
of All Those Similarly Situated, Appellant,

v.

NATIONWIDE MUTUAL INSURANCE COMPANY.

Superior Court of Pennsylvania.

Argued Dec. 17, 1992.

Filed May 5, 1993.

Reargument Denied July 12, 1993.

200

William T. Barker, Chicago, IL, for appellant (at 69).

Morris M. Shuster, Haverford, for appellants (at 330, 331, 333, 338, 443 and 2257) and appellees (at 69, 125, 146, 185, 332 and 2256).

James T. Moughan, Philadelphia, for appellants (at 125 and 146) and appellee (at 330 and 331).

Alan D. Windt, Philadelphia, for appellee (at 338).

William C. Foster, Philadelphia, for appellee (at 443).

James R. Kahn, Philadelphia, for appellant (at 2256) and appellees (at 2257).

James C. Haggerty, Philadelphia, for appellants (at 332) and appellees (at 333).

Gerard F. Lipsky, Philadelphia, for appellant (at 185).

Before McEWEN, BECK and HESTER, JJ.

BECK, Judge.

The issue in these combined appeals is whether plaintiffs-appellees are entitled to recover no-fault insurance benefits for medical expenses previously paid by Medicare, interest accrued on the unpaid benefits, and attorneys' fees. We affirm the trial court and conclude that plaintiffs-appellees are entitled to the benefits and interest, but not attorneys' fees.

## FACTS AND BACKGROUND

Individuals representing classes of similarly situated insureds brought these actions against appellants Allstate Insurance Company ("Allstate"), Liberty Mutual Insurance Company, Colonial Penn Insurance Company ("Colonial Penn"), State Farm Mutual Automobile Insurance Company, Southeastern Pennsylvania Transportation Authority ("SEPTA"), and Nationwide Mutual Insurance Company ("Nationwide"). The cases were submitted to the trial court on cross-motions for summary judgment with stipulated facts.

Each plaintiff was injured in a motor vehicle accident after December 5, 1980, and incurred certain medical expenses as a result. Each was eligible to receive basic loss benefits for medical treatment under a no-fault insurance policy, pursuant to the Pennsylvania No–Fault Motor Vehicle Insurance Act ("No–Fault Act"), 40 P.S. §§ 1009.101 *et seq,* since repealed.[1] In addition, each plaintiff was eligible to receive Medicare benefits, under 42 U.S.C. § 1395. It was agreed by the parties that all medical expenses submitted by the plaintiffs were reasonable and necessary and were for services provided by "participating" providers under Medicare who were "accredited" under the No–Fault Act.

All of the plaintiffs' medical and other accident-related expenses have been paid. Although the defendant insurers reimbursed plaintiffs for excess medical and non-medical "basic loss" expenses, they argue that Medicare was the primary insurer for the medical expenses. Consequently, the insurers made no payment for medical expenses until a Medicare disposition was received, and then only to the extent that Medicare had not paid. Plaintiffs brought these actions to recover the unpaid no-fault medical benefits, interest accrued thereon, and attorneys' fees.

Prior to December 5, 1980, no-fault benefits were indeed secondary to Medicare payments. Section 206 of the No–Fault Act provided, in pertinent part, as follows:

(a) General.—Except as provided in section 108(a)(3) of this act, all benefits or advantages ... that an individual receives or is entitled to receive from Social Security, ... workmen's compensation, any State-required temporary, nonoccupational disability insurance, and all other benefits ... received by or available to an individual because of the injury from any government, *unless the law authorizing or providing for such benefits or advantages makes them*

---

1. Although not an insurance company, defendant SEPTA is a self-insured entity which, pursuant to 40 P.S. § 1009.103 (repealed), is an "obligor" under the No–Fault Act and has the same rights and responsibilities as the private insurers. The term "insurers" will be used to refer to all defendants, including SEPTA.

*excess or secondary to the benefits in accordance with this act,* shall be subtracted from loss in calculating net loss. 40 P.S. § 1009.206 (repealed) (emphasis added). This cost-cutting measure expressly provided for an automatic adjustment in the payment priority scheme if the law relating to government benefits were to change.

On December 5, 1980, the federal government did make a change in the existing priority scheme when it enacted the Omnibus Reconciliation Act ("ORA"). Certain amendments enacted through the ORA made Medicare secondary or excess to no-fault benefits:

(1) Payment under this subchapter may not be made with respect to any item or service to the extent that payment has been made, or can reasonably be expected to be made (as determined in accordance with regulations), with respect to such item or service, under a workmen's compensation law or plan or the United States or a State *or under an automobile or liability insurance policy or plan (including a self-insured plan) or under no-fault insurance.* Any payment under this subchapter with respect to any item or service shall be conditioned on reimbursement to the appropriate Trust Fund established by this subchapter when notice or other information is received that payment for such item or service has been made under such a law, policy, plan, or insurance. . . .

42 U.S.C. § 1395y(b)(1) (additions underlined). The effective date of the ORA was the date of enactment, December 5, 1980, and its stated purpose was to effectuate "substantial savings in Fiscal Year 1981." 1980 U.S. Code Cong. & Ad. News 5526, at 5528.

The trial court, through the Honorable Bernard J. Goodheart, granted summary judgment in favor of the plaintiffs, and held that, *inter alia:* plaintiffs have standing to bring these actions; the ORA's changes in the priority of Medicare benefits were effective on December 5, 1980 and no later; the coordination of benefits clauses in the Allstate and Nationwide policies did not negate the effect of this federal statute; and

the plaintiffs were entitled to interest on the overdue no-fault benefits. Judge Goodheart also held that plaintiffs were not entitled to attorneys' fees as a matter of law, although the parties did not raise this issue on their cross-motions for summary judgment. These timely appeals followed.

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Pa.R.Civ.P. 1035(b). Because the parties stipulated to the relevant facts, this matter was ripe for summary judgment. With the exception of the trial court's conclusion that the federal government does not have a right of subrogation against the plaintiffs for the interest awarded, we affirm the order below.[2]

## ISSUES ON APPEAL

The issues raised on appeal may be summarized as follows:

1. Are plaintiffs proper parties to maintain this action for no-fault benefits when:

(a) it is undisputed that all benefits allegedly due would belong to the United States, which paid Medicare benefits for the same expenses, and the United States also claims an interest in any ancillary amounts due;

(b) the United States is not a party to the action, has not authorized plaintiffs to maintain the action on its behalf, and has not agreed to be bound by the adjudication in this action; and

(c) plaintiffs are not aggrieved by defendants' failure to pay no-fault benefits because plaintiffs would be no better off had no-fault benefits, instead of Medicare benefits, been paid for the medical expenses in question?

2. As is discussed below, the issue of the United States' right to the interest awarded the plaintiffs is not properly before us, as the federal government was not a party to these actions. We therefore do not express an opinion on this matter.

2. Did defendants properly subtract Medicare benefits from medical expenses to compute the loss payable to plaintiffs?

3. Are defendants liable for interest on overdue no-fault benefits where the accident victims did not suffer any delay in payment because Medicare paid the expenses in question?

4. Where a coordination of benefits endorsement was included in a policy, was the insurer required to pay no-fault benefits after Medicare, a collateral source, paid the medical expenses?

5. Is defendant SEPTA liable for interest under the Sovereign Immunity Act and Tort Claims Act?

6. Did the trial court err in deciding that attorneys' fees were not recoverable as a matter of law?

## STANDING

The insurers initially argue that this court need not reach the merits of this case because plaintiffs have no standing to bring the actions for benefits. This argument has several layers, but is grounded in the fact that plaintiffs must reimburse the federal government if they recover benefits from the no-fault insurers.

The relevant section of the ORA states that any Medicare payment for the covered medical treatment "shall be conditioned on reimbursement to the appropriate Trust Fund ... when notice or other information is received that payment for such item or service has been made under" no-fault insurance. 42 U.S.C. § 1395y(b)(1). The plaintiffs have acknowledged and stipulated that if they recover no-fault benefits for the expenses previously paid by Medicare they will remit any such net recovery to Medicare. The defendant insurers take this to mean that the cause of action for the no-fault benefits actually belongs to the federal government, not the plaintiffs, and that since plaintiffs' medical bills were timely paid by someone, i.e., Medicare, they have not been "aggrieved" by the non-payment of no-fault benefits.

At first blush, this argument has appeal. However, the fact that the plaintiffs have certain statutory obligations *vis a vis* the federal government does not alter the fact that this actually is a contract action, based on a relationship between the plaintiffs and the defendant insurers. The plaintiffs paid money to the defendants in exchange for certain insurance coverage, including coverage for medical expenses incurred in a covered motor vehicle accident.[3] The defendants failed to pay for such expenses, although they admit that the expenses incurred were "covered" under the policies. Therefore, plaintiffs argue that the insurance contracts were breached, and there arose a cause of action.

▆▆ Where an insured has paid premiums to a no-fault insurer, the possibility of a "double recovery" by the insured does not preclude the viability of an action for benefits.

[T]he fact that a claimant under the No–Fault Act has received compensation from a source other than the no-fault insurer is without relevancy in a suit brought by the claimant against the insurer to recover basic loss benefits for which the full premium has been paid.

*Steppling v. Pennsylvania Manufacturers' Association Insurance Co.*, 328 Pa.Super. 419, 477 A.2d 515, 521 (1984). *See also Hauck v. Ohio Casualty Grp.*, 361 Pa.Super. 370, 522 A.2d 628 (1987).

Nonetheless, the insurers argue that the plaintiffs have no pecuniary stake in the outcome of this matter since they have no outstanding medical bills and they have agreed that Medicare is entitled to reimbursement for payments made. However, the plaintiffs allege a contractual right to the benefits owed, regardless of any independent claim to those benefits asserted by the United States. Moreover, the plaintiffs claim entitlement to interest on the overdue benefits as well as attorneys' fees. Their claim is direct and pecuniary, and therefore it is sufficient to establish standing. *William Penn*

---

**3.** In SEPTA's case, the No–Fault Act imposes the same obligation to pay medical expenses incurred by victims of accidents involving SEPTA's self-insured vehicles. 40 P.S. § 1009.103 (repealed).

*Parking Garage v. City of Pittsburgh,* 464 Pa. 168, 346 A.2d 269 (1975) (standing is established if the plaintiff's claim is "substantial," or direct and pecuniary).

█ The insurers' next argument on this issue is that these actions have not been prosecuted in the name of the real party in interest, the United States. Pa.R.Civ.P. 2002.[4] The real party in interest "has the power to discharge the claim upon which suit is brought and to control the prosecution of the action brought to enforce rights arising under the claim." Standard Pa.Prac.2d § 14.17 (1981). *See also Spires v. Hanover Fire Insurance Co.,* 364 Pa. 52, 58, 70 A.2d 828, 831 (1950), *overruled on other grounds, Guy v. Liederbach,* 501 Pa. 47, 459 A.2d 744 (1983). In arguing that plaintiffs are not the real parties in interest, the insurers evidently are concerned that, regardless of the outcome here, they may be subject to a second action brought by the United States based on its alleged rights to the benefits and interest at issue. However, since the right to benefits and interest is derived from a contract between the *plaintiffs* and the *insurers,* this argument is meritless. The fact that a federal statute gives the United States an independent right of reimbursement against the plaintiffs does not make it the real party in interest in this contract action. *See Spires, supra* (the real party in interest is not necessarily the person who ultimately may be entitled to

4. The Rule provides:
RULE 2002. PROSECUTION OF ACTIONS BY REAL PARTIES IN INTEREST. EXCEPTIONS.
   (a) Except as otherwise provided in clauses (b), (c) and (d) of this rule, all actions shall be prosecuted by and in the name of the real party in interest, without distinction between contracts under seal and parol contracts.
   (b) A plaintiff may sue in his own name without joining as a plaintiff or use-plaintiff any person beneficially interested when such plaintiff (1) is acting in a fiduciary or representative capacity, which capacity is disclosed in the caption and in the plaintiff's initial pleading; or (2) is a person with whom or in whose name a contract has been made for the benefit of another.
   (c) Clause (a) of this rule shall not apply to actions where a statute or ordinance provides otherwise.
   (d) Clause (a) of this rule shall not be mandatory where a subrogee is the real party in interest.

the benefits of any recovery obtained).[5]

Finally, the insurers argue that the plaintiffs, "rather than simply seeking to pursue any interest of their own, effectively seek to represent the United States and procure a judgment binding it." Joint Brief of Defendants at 20. The insurers assert that this "representation" is without the United States' consent and thus violates the doctrine of sovereign immunity. However, as we have already stated, the plaintiffs brought these actions based on their contractual relationship with the defendant insurers. The fact that the United States has an interest in the action, founded upon a federal statute which gives it a right to pursue reimbursement from the plaintiffs, does not implicate the doctrine of sovereign immunity. Therefore, we need not reach the tangential question of whether the United States has consented to this action.[6]

The trial court properly held that plaintiffs have standing to prosecute these actions.

## EFFECTIVE DATE OF THE ORA PROVISION

■ Before the ORA effected changes in the priority scheme for Medicare and other medical benefits plans, Pennsylvania's No–Fault Act clearly made Medicare payments primary to no-fault basic loss benefits. 40 Pa.C.S.A. § 1009.-206 (repealed). The insurers argue that they continued to subtract Medicare payments from the total medical expenses incurred by plaintiffs until the new priority scheme became effective. Although the effective date of the ORA was Decem-

5. The defendants have argued elsewhere in their briefs that the United States is subrogated to the interests of the plaintiffs, and thus Rule 2002(d) would be applicable to allow plaintiffs to maintain these actions. Obviously, to prevail on the subrogation argument would mean that defendants lose on their claim that plaintiffs are not the real parties in interest. Nevertheless, as is discussed in more detail below, we do not reach the merits of the subrogation issue.

6. The trial court found that the United States had impliedly consented to plaintiffs' maintaining these actions through a letter that stated that it had "no objection" thereto. We note that the United States filed an amicus brief in this court which expressly states that it has consented to these actions. Brief of Louis W. Sullivan, M.D., Secretary, United States Dept. of Health and Human Services at 14, n. 6.

ber 5, 1980, the insurers assert that Medicare payments did not actually become secondary to no-fault benefits until certain related regulations were promulgated on June 6, 1983. This is despite the fact that the regulations, by their terms, apply to "accidents that occurred on or after December 5, 1980." 42 C.F.R. § 405.322(a).[7] As a result, the insurers did not follow the priority scheme outlined in Section 1395y(b)(1) until June 6, 1983.[8]

In holding that Medicare payments became secondary to no-fault benefits as of December 5, 1980, we refer to Judge Goodheart's thorough analysis:

> Throughout the voluminous history of the 1980 Act [ORA], a repeated aim was to effectuate immediate savings by making Medicare secondary to automobile insurance, including no-fault insurance. This goal is enunciated in the House, Senate and Conference versions of the bill as well as the various Committee Reports from which the versions of the bill arose. See, e.g., H.R. 3990, § 825, 1980 U.S. Code Cong. & Ad. News 5752; House Conference Report No. 96–1479, page 133, at 1980 U.S. Code Cong. & Ad. News 5924; Committee on Ways and Means Report, 1980 U.S. Code Cong. & Ad. News 5616, 5717; Congressional Budget Office Cost Estimate, 1980 U.S. Code Cong. & Ad. News 5885. Indeed, the Budget Office's projection of savings resulting from the amendment includes a projected savings of eight million dollars in Fiscal 1981. Clearly, through this amendment Congress sought to save money immediately.

Tr. Ct. Opinion at 13.

The insurers argue that, although the aim of the federal amendments was to make Medicare benefits secondary to automobile insurance, their enactment alone did not accomplish that goal; rather, the ORA merely established a frame-

---

**7.** The insurers' argument is based on language in 42 C.F.R. § 405.-323(a) which states that the regulations apply to services furnished after June 6, 1983 where payments "can reasonably be expected" under no-fault insurance. In these cases, the no-fault insurers denied payment, and therefore this later effective date is inapplicable.

**8.** All of the benefits at issue in these cases accrued between December 5, 1980 and June 6, 1983.

work for regulations which eventually would effectuate the proposed changes. In support of their contention, the insurers point to the parenthetical phrase in § 1395y(b)(1): "as determined in accordance with regulations." At most, this qualifying phrase applies to payments not yet made by Medicare for items covered under private insurance. The instant matters, in contrast, deal with the relative priority of Medicare benefits and automobile insurance coverage where Medicare has already paid. Specifically, the issue is whether automobile insurers can avoid paying claims by delaying payment until Medicare has acted on a claim, and then refusing payments to the extent of the Medicare payment. To accept the defendants' position would be to override the clear intent of Congress to make Medicare secondary to automobile insurance.

Congress specifically included language in the ORA to preserve Medicare's right to reimbursement when and if medical benefits are paid by a private insurer. Although the rules governing such reimbursement and other conditional payments were elaborated upon in the regulations promulgated thereafter, the 1980 amendments immediately reversed the priority of payments between Medicare and private insurers. *See, e.g., Colonial Penn Insurance Co. v. Heckler,* 721 F.2d 431, 441 (3d Cir.1983) (regulations promulgated under ORA are retroactive to December 5, 1980). In *Colonial Penn,* the Third Circuit Court of Appeals upheld the regulations promulgated under the ORA, and in doing so noted that the defendant insurer "knew as of December 5, 1980 that Congress had changed the pre-existing priority of payments." *Id.* at 441. If such a change affects state insurance law, then it does so as permissible congressional pre-emption of state law under the McCarran–Ferguson Act, 15 U.S.C. § 1012. *Id.* at 442, n. 6.[9]

9. The *Colonial Penn* case involved the interaction of Pennsylvania law with the ORA. Another federal court has reached similar conclusions when dealing with state automobile insurance law in relation to Medicare. In *Abrams v. Heckler,* 582 F.Supp. 1155 (S.D.N.Y.1984), the court held that, notwithstanding the Medicare-offset provision of New York's state motor vehicle insurance law, under the ORA Medicare is secondary to auto insurance benefits. "Although Congress did not, in so many words, declare its awareness that in passing [the amendments] it would supersede state Medicare-offset laws, the Court must infer that Con-

*Colonial Penn* was decided after the promulgation of the relevant regulations. We note that another court reached the same conclusion before they became effective. In *American Risk Assurance Company v. Benrube*, 407 So.2d 993 (Fla.Dist. Ct.App.1981), the court held that "[a] private insurer may not refuse to pay benefits for which it is primarily liable for the reason that those expenses have been paid by Medicare." *Id.* at 994–95. In *American Risk*, as in the case at hand, Medicare had paid a substantial portion of the claimant's medical expenses and the insurer had a policy of not paying for anything until a Medicare disposition was received. The insurer then would pay benefits only to the extent that Medicare had not paid. The court found that such a non-duplication policy could not be applied to Medicare benefits because of the clear language of the ORA. *Id. See also Smith v. Travelers Indemnity Co.*, 763 F.Supp. 554 (M.D.Fla.1989) (Medicare is secondary to private insurance covering accident which occurred on March 1, 1983).

We hold that on December 5, 1980, the effective date of the ORA, Congress made Medicare benefits secondary to no-fault basic loss benefits. The defendant insurers are liable to the plaintiffs for the full amount of the expenses paid by Medicare on behalf of the plaintiffs, to their respective policy limits. Pursuant to the federal statute and the plaintiffs' own stipulations, the plaintiffs shall reimburse the appropriate Medicare Trust Fund for these amounts upon receipt of payment.

## COORDINATION OF BENEFITS CLAUSES

In addition to claiming that the new priority scheme of the ORA did not become effective until after June 6, 1983, defendants Nationwide and Allstate argue that their insureds' policies included coordination of benefits ("COB") clauses which made no-fault benefits secondary to other insurance plans. Neither insurer's contention has merit.

gress intended to do so when such would plainly be the result of effectuating the statute's clearly articulated purpose." *Id.* at 1165. Certainly, if the federal law preempts Medicare set-off provisions explicitly embodied in state laws, then it also overrides any such internal policy unilaterally adopted by individual insurers.

Plaintiff Tucker's husband [10] had the option of designating other personal insurance as primary medical coverage in return for a reduced premium charged by Nationwide. The language of the COB endorsement states that Nationwide:

> will pay benefits for professional medical treatment and care only over and above all amounts paid or payable to or for you or your relatives under the following: any other disclosed insurance, service, benefits, or reimbursement plans that provide similar direct benefits for motor vehicle accidents without regard to fault.

The only insurance "disclosed" on the policy as primary was Tucker's group health insurance, provided by his employer. Medicare is not listed as the primary insurance, and therefore any argument that the COB clause makes Medicare primary must fail.

Even if Medicare were listed as the primary insurer for purposes of obtaining a reduced premium, the supremacy of the federal priority scheme enacted by the ORA would make this clause ineffectual.[11]

The COB clause in the Allstate insurance policy issued to plaintiff Collins mirrors the language in § 206 of the No–Fault Act. The clause provides that amounts payable under Allstate's policy shall be reduced by the amount the claimant receives or is entitled to receive under government benefit programs, *except* that "[b]enefits *excess or secondary by law* to the benefits provided by this coverage *shall not reduce the amount payable*" by Allstate. (Emphasis added.) Since December 5, 1980, and at the time relevant to these actions, Medicare benefits were "secondary by law" to no-fault benefits, and Allstate's COB argument cannot prevail. The COB clauses relied upon by defendants Allstate and Nationwide do not support their non-payment of basic loss benefits.

10. Tucker made her claim against Nationwide through her husband's policy.

11. Although Tucker's policy did not present such a situation, other class members who did list Medicare as their primary insurer and received a premium discount from the insurer shall have the amount of the discount deducted from any recovery from the insurer.

## INTEREST

■ In addition to no-fault benefits, the plaintiffs seek interest on the benefits which remain unpaid. The No–Fault Act provides, in pertinent part:

No-fault benefits are overdue if not paid within thirty days after the receipt by the obligor of each submission of reasonable proof of the fact and amount of loss sustained .. Overdue payments bear interest at the rate of eighteen percent (18%) per annum....

40 P.S. § 1009.106(a)(2) (repealed).

The language of the statute is clear and unambiguous. The only condition precedent to the accrual of interest is that the payment of benefits be overdue. The reason for the late payment is irrelevant. *Hayes v. Erie Exchange,* 493 Pa. 150, 153–55, 425 A.2d 419, 420–21 (1981). *See also Steppling,* 328 Pa.Super. at 431, 477 A.2d at 521; *Kintz v. Nationwide Mutual Insurance Co.,* 323 Pa.Super. 3, 469 A.2d 1131, 1134 (1983); *Hall v. Midland Insurance Co.,* 320 Pa.Super. 281, 467 A.2d 324 (1983). This is so even where collateral benefits were timely received. *Steppling, supra.*

It is clear that the defendant insurers owe interest on the unpaid no-fault benefits.[12] The question remains as to whom the interest must be paid. Plaintiffs argue that they are entitled to the interest on the overdue benefits. Defendants assert that if interest is owed, it is owed to the United States government, which actually lost the use of the money paid for the plaintiffs' medical expenses. We hold that the plaintiffs may recover the interest on the benefits owed them, but we do not decide whether or not plaintiffs have an obligation to pay

**12.** This is true for defendant SEPTA as well, despite the fact that it is a commonwealth agency. *Feingold v. SEPTA,* 512 Pa. 567, 517 A.2d 1270 (1986) (SEPTA is "commonwealth agency"). *See Hill v. Port Authority Transit System,* 137 Pa.Cmwlth. 132, 585 A.2d 1129 (1991) (claimant entitled to award of interest from self-insured commonwealth agency for late payment of no-fault benefits). Although SEPTA's liability is limited under 42 Pa.C.S.A. § 8528 to a total damages award of $250,000, that statute does not preclude an award of interest. *Hill, supra.*

the interest over to the United States, which is not a party to this action.

As we discussed previously, the plaintiffs have sued the insurers based on the contractual relationship between them. It is the plaintiffs who own the right to the unpaid benefits, i.e., the principal of the debt. Any interest which has accrued on the overdue principal also belongs, at least initially, to the plaintiffs. *See, e.g., Roos v. Fairy Silk Mills*, 342 Pa. 81, 19 A.2d 137 (1941) (interest is not a separate form of damages but is a substantive part of the debt as much as the principal is); *Watson v. McManus*, 223 Pa. 583, 72 A. 1066 (1909) (same).

However, the trial court went further and decided that the United States government has a *right to reimbursement for the benefits only,* rather than a broader *right of subrogation to the entire bundle of rights belonging to the plaintiffs, including the interest owed.* We need not and cannot decide this issue, as one of the interested parties is not before us. We therefore do not address the question of whether the United States may pursue an action against the plaintiffs for the interest, and the trial court's ruling on this isolated issue is vacated.

We affirm the award of interest to the plaintiffs, in accordance with § 106(a)(2) of the No–Fault Act.[13]

## ATTORNEYS' FEES [14]

Plaintiffs have made a claim for attorneys' fees pursuant to the No–Fault Act. They rely upon two sections of the law in their arguments.

13. We recognize that this award appears to be a windfall to the plaintiffs. However, they are entitled to the money under the No–Fault Act. Not to impose an obligation for interest on the defendant insurers would be to give a windfall to *them.*

14. The parties agree that this issue was not raised in their cross-motions for summary judgment, and that the trial court addressed the question of attorneys' fees *sua sponte.* After our review of the record, we find no reversible error in the trial court's decision to dispose of the entire matter on the undisputed facts stipulated by the parties. We

## Section 107(3)

■ The No–Fault Act authorizes an award of attorneys' fees where the insurer has acted unreasonably, or in "bad faith":

(3) If, in any action by a claimant to recover no-fault benefits from an obligor, the court determines that the obligor has denied the claim or any significant part thereof without reasonable foundation, the court may award the claimant's attorney a reasonable fee based upon actual time expended.

40 P.S. § 1009.107(3) (repealed). Unlike § 106, which mandates an award of interest where benefits are overdue, § 107(3) leaves the issue of attorneys' fees to the court's discretion. Our supreme court has interpreted the section's language to require a finding of "bad faith" on the part of the insurer. *Hayes,* 493 Pa. at 154, 425 A.2d at 421. Where an insurer's arguments for denial of a claim are not frivolous, attorneys' fees need not be awarded, although interest must be charged. *Id.* at 160, 425 A.2d at 424.

In this case, "[o]ur own review of the record has disclosed an issue worthy of litigation and not manufactured without reasonable foundation or in bad faith." *Hall,* 320 Pa.Super. at 289, 467 A.2d at 328. Here, the defendant insurers litigated a non-frivolous issue involving federal statutes and regulations, and presented authority to support their theories. Although their interpretations were incorrect, their arguments apparently were made in good faith. An award of attorneys' fees under § 107(3) is not warranted. *Cf. Johnson v. State Farm Mutual Automobile Insurance Co.,* 339 Pa.Super. 112, 488 A.2d 335 (1985) (defendant insurer liable for counsel fees under § 107(3) where it cited no case law or other authority to support its position).

## Section 107(1)

■ The plaintiffs claim that they are entitled to attorneys'

hold that there is no genuine issue of fact material to the attorneys' fees question, and decide it as a matter of law.

fees under § 107(1) of the No–Fault Act.[15] That section provides:

> (1) If any overdue benefits are paid by the obligor after receipt by the obligor of notice of representation of a claimant in connection with a claim or action for the payment of no-fault benefits, a reasonable attorney's fee (based on actual time expended) shall be paid by the obligor to such attorney.

40 P.S. § 1009.107(1) (repealed). Plaintiffs argue that, since any payment of benefits in these cases will necessarily come "after receipt by the obligor of notice of representation" of the plaintiffs by attorneys, counsel fees *must* be paid. However, plaintiffs' contention is undermined by our recent decision in *Freeze v. Donegal Mutual Insurance Co.,* 412 Pa.Super. 305, 603 A.2d 595 (1992).

In *Freeze,* a panel of this court held that a no-fault insurer's potential liability under § 107(1) ends upon timely rejection of a no-fault claim. Once such a rejection is made, claimants must look to § 107(3) for recovery of counsel fees. *Id.* at 315, 603 A.2d at 600. *See also Lee v. Safeguard Mutual Insurance Co.,* 379 Pa.Super. 104, 549 A.2d 927 (1988) (when a claimant is not timely notified of the rejection of a claim the legislature has provided for recovery of counsel fees). If we were to interpret § 107(1) as mandating the imposition of attorneys' fees whenever benefits are overdue, § 107(3) would become meaningless; claimants no longer would be required to show unreasonable conduct by the insurer to recover counsel fees. *Freeze,* 412 Pa.Super. at 315, 603 A.2d at 600. When construing a statute, we must attempt to give effect to every word, thereby avoiding the creation of surplusage. *Id.,* citing *Habecker v. Nationwide Ins. Co.,* 299 Pa.Super. 463, 471, 445 A.2d 1222, 1226 (1982).

In *Freeze* and *Lee,* this court set forth certain factors which must exist before a fee award under § 107(1) can be made:

---

15. The trial court did not address this particular section of the No–Fault Act in its discussion of attorneys' fees.

(1) On a particular date, [plaintiffs] provided reasonable proof of the fact of loss and amount of loss incurred;

(2) [Plaintiffs were] not paid no-fault benefits by [defendants] prior to the filing of a notice of representation by [plaintiffs'] counsel;

(3) A notice of representation was filed when payments were overdue pursuant to section 106; [16] and

(4) [Defendants] did not notify [plaintiffs] within thirty days "after the receipt of reasonable proof of loss" of any denial of benefits.

*Freeze,* 412 Pa.Super. at 314, 603 A.2d at 599, citing *Lee, supra.*

We have analyzed the record and stipulated facts in light of these requirements. First, plaintiffs did provide reasonable proof of the fact and amount of loss to the insurers. Second, certain no-fault benefits were not paid to the plaintiffs. However, the remaining factors are not present here.

Section 107(1) is designed to penalize untimely action by insurers, whose untimeliness requires retention of counsel. *See Lee, supra. See also Labrador v. City of Philadelphia,* 134 Pa.Cmmwlth. 427, 578 A.2d 634 (1990). Here, plaintiffs already had retained counsel before or during the initial presentation of their claims to the insurers; thus, the retention of counsel was not the result of unreasonable delay by the defendants.

Moreover, the penalty authorized by § 107(1) is designed to ensure that the claimant is timely notified of the rejection of a claim and the reasons for the rejection, and that the claimant is informed of her right to obtain an attorney. 40 P.S. § 1009.106(a)(5) (repealed). In these cases, the insurers made

---

**16.** Section 106(a)(5) states in relevant part:

An [insurer] who rejects a claim for basic loss benefits shall give to the claimant written notice of the rejection promptly, but in no event more than thirty days after the receipt of reasonable proof of the loss. Such notice shall specify the reason for such rejection and inform the claimant of the terms and conditions of his right to obtain an attorney.

40 P.S. § 1009.106(a)(5) (repealed).

certain payments within thirty days of the receipt of proof of loss, and denied other payments within that time period by explaining that Medicare was the primary obligor for the loss.[17] Obviously, since the plaintiffs already were represented by counsel at the relevant times, there was no need formally to notify them of the "terms and conditions of [their] right to obtain an attorney." *Id.* Under these circumstances, plaintiffs are not entitled to attorneys' fees under § 107(1).

## CONCLUSION

We affirm the trial court's orders granting summary judgment in favor of the plaintiffs on the issues of no-fault benefits and interest, and in favor of the defendants on the issue of attorneys' fees.

Order affirmed.

---

17. Our review of the record reveals that the Byrne claim was submitted to SEPTA on August 11, 1983 and SEPTA acted on the claim 22 days later, on September 2, 1983, paying amounts not covered by Medicare. The Conyers and Abramson claims first were submitted to their no-fault insurers after Medicare acted, and their respective attorneys were given written notice within 30 days that payment was being limited to amounts not paid by Medicare. Coopersmith's lawyer was advised of Liberty Mutual's position on COB by letter before any bills had been submitted. Allstate received the first bill relating to Collins' claim directly from the provider on August 3, 1981 and responded with a letter, stating that it believed Medicare was primary; on August 19, 1981 the same information was orally conveyed to counsel for Collins. Tucker was also timely notified that her husband's COB election made Medicare primary and no-fault excess.

Moreover, the parties stipulated to the fact that "[p]rior to June 6, 1983, [the insurers] generally would, in response to inquiries and/or as a matter of course during the handling of a claim, notify a Medicare-eligible claimant and/or providers that [they] believed that Medicare coverage was primary to No–Fault coverage, that applicable bills should be submitted to Medicare first, and that [the insurers] would await Medicare action on the claim."