Jeffrey M. HARTMAN, Appellee,

v.

Frederick P. BAKER, Individually and t/d/b/a Baker Installations; and Baker Installations Corporation, Appellants.

Superior Court of Pennsylvania.

Argued Oct. 28, 1999.

Filed May 3, 2000.

Reargument Denied July 12, 2000.

Mark S. Frank, Pittsburgh, for appellant.

Robert R. Leight, Pittsburgh, for appellee.

Before POPOVICH, JOYCE and BROSKY, JJ.

POPOVICH, J.:

¶ 1 Appellants[1] appeal from the final decree docketed on December 1, 1998, from the Court of Common Pleas of Allegheny County. Appellants filed a motion to vacate the adjudication and decree nisi and for recusal. On July 23, 1998, the trial court dismissed these motions. Appellants filed a timely notice of appeal. Upon review, we affirm in part and vacate in part the final decree.

¶ 2 Herein appellants ask the following:

1. Did the February 12, 1985 and February 25, 1985, memoranda evidence a contract formed between Appellee and Baker or were they evidence of preliminary negotiations to enter into a contract at some time in the future?

2. Did the purported "phantom equity" alleged given to Appellee by Appellants constitute wages within the meaning of the Pennsylvania Wage Payment and Collection Law?

3. Assuming the fact finder determines that the employer does owe wages to the employee, does the burden of proving that the employer's good faith contest regarding the issue of the payment of liquidated damages under § 260.10 of the WPCL fall upon the Appellee employee or the Defendant employer?

4. By what burden of proof must the party prove that a good faith contest or dispute existed regarding the payment of wages, assuming that wages are found to be due and owing, sufficient to require the payment of liquidated damages pursuant to Section 10 of the Wage Payment and Collection Law?

5. Is the Appellee in a WPCL action entitled to a presumption that the defendant acted in bad faith if the Appellee wins the underlying claim for wages?

6. Were the wages with respect to the Times Mirror contract not paid based upon a good faith contest or dispute over those purported wages claimed due and owing, and if so, is it the basis for depriving Baker of any claim of a good faith defense to the WPCL claim?

¶ 3 The following is the proper scope of review in an appeal from a final decree:

The findings of the Chancellor will not be reversed unless it appears that he has clearly abused his discretion or committed an error of law. Where credibili-

1. Appellants consist of Frederick P. Baker, individually and t/d/b/a Baker Installations, a/k/a Baker Leasing and Baker Installations Corporation.

ty of witnesses is important to the determination, the Chancellor's findings are entitled to particular weight because of his opportunity to observe their demeanor. Where a reading of the record reasonably can be said to reflect the conclusions reached by the Chancellor, a reviewing court may not substitute its judgment for that of the Chancellor. A reviewing court, however, is not bound by findings which are without support in the record or have merely been derived from other facts.

*Bortz v. Noon*, 556 Pa. 489, 497, 729 A.2d 555, 559 (1999)(quoting *Rusiski v. Pribonic*, 511 Pa. 383, 389–390, 515 A.2d 507, 510 (1986)).

¶ 4 Applying this standard of review to the present case reveals the following: Appellee began employment with appellants as a cable installer on or about June 26, 1980. Appellee's job responsibilities steadily increased, and appellant began to base appellee's income upon a percentage of the gross revenue of the company. In late 1984 or early 1985, appellee shared with Frederick P. Baker an article regarding innovative pay structures. A dialogue between Mr. Baker and appellee began wherein the parties contemplated a change in appellee's compensation formula. This dialogue focused on reducing appellee's compensation in order to provide funds to pay other employees to assume some of appellee's duties as a result of the company's growth. Mr. Baker wished to change appellee's compensation from a percentage of gross revenue to a formula based, in whole or in part, upon net profit, and discussions about appellee obtaining an equity interest in the company began.

¶ 5 Those discussions resulted in Mr. Baker submitting to appellee a memorandum dated February 12, 1995 with the heading "Subject: Contract agreement between Fred Baker and [appellee]." This document became the subject of further discussions between the parties and was marked up with handwriting. On February 25, 1995, Mr. Baker presented a revision of the original memorandum. The following are relevant excerpts from the revised memorandum:

-This contract is to be consummated thirty (30) days from this date.

-The management fee which Baker Installations pays to [appellee] will become 2% of the current factor referenced by previous contract arrangements between [appellee] and Fred Baker.

-The purpose of this change in percentage factor permits the employment of Sam Colletts by Baker Installations under the supervision of Fred Baker and [appellee].

-A non-voting equity position is also hereby granted to [appellee] as follows:

-The purpose and intent of the above described outline is to provide an additional incentive through an equity ownership to improve the position of Baker Installations; and thereby create previously non-existing monies which may be mutually shared by Fred Baker and [appellee] as a result of improved performance and/or improved size of Baker Installations.

Neither the February 12, 1985 memorandum nor the revised February 25, 1985 memorandum was signed by the parties.

¶ 6 On March 25, 1985, appellee's "management fee" was reduced to the 2% set forth in the revised memorandum. In mid–1988, Mr. Baker wanted to change appellee's pay rate and revisit the revised memorandum. In January 1989, Mr. Baker proposed a series of three employment agreements which would have effectively cancelled any alleged agreement found in the revised February memorandum. Appellee declined to sign any of these agreements and informed Mr. Baker that he intended to exercise his equity position. In March 1989, after appellee had announced his desire to exercise his equity position, appellee's pay structure was changed to a salary-plus-bonuses without any discussion or agreement by appellee.

By letter dated June 16, 1989, appellee resigned.

¶ 7 Appellants disputed the existence of a binding agreement with regards to the equity interest and did not honor appellee's request to exercise his equity interest. Consequently, appellee filed suit, alleging, among other things, a violation of the Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 P.S. §§ 260.1–260.45. Appellee argued that the equity interest constituted "wages" under the WPCL, and that appellants' failure to pay these "wages" entitled appellee to liquidated damages pursuant to § 260.10 of the WPCL.

¶ 8 The parties stipulated that the amount of wages foregone by appellee as a result of the reduction in his percentage of gross revenues as stated in the revised memorandum through his resignation was $51,668.26. The parties further stipulated that for purposes of appellee's claim that he was entitled to an equity interest in Baker Installations, an award of monetary damages should be based on that figure. The Chancellor decreed the following:

1. Appellee was entitled to the equity interest in the sum of $51,668.26 together with interest accruing from July 11, 1989 in the amount of $27,900.

2. Appellee was entitled to recover liquidated damages in the amount of 25% of $51,668.26, or $12,917.07.

3. Appellee was entitled to recover attorneys' fees in the amount of one-third of the aggregate amount which he was entitled to recover, or $30,828.74.[2]

Appellants filed a timely notice of appeal.

■■■ ¶ 9 We begin by determining whether the record supports the Chancellor's finding that the revised February memorandum as well as the parties' conduct evidenced the formation of a contract

between the parties of the present case. "The law of this Commonwealth makes clear that a contract is created where there is mutual assent to the terms of a contract by the parties with the capacity to contract." *Shovel Transfer and Storage, Inc. v. Pennsylvania Liquor Control Bd.*, 559 Pa. 56, 62–63, 739 A.2d 133, 136 (1999), reargument denied, 1999 Pa. LEXIS 3670 (1999)(citing *Taylor v. Stanley Co. of America*, 305 Pa. 546, 158 A. 157 (1932)). "If the parties agree upon essential terms and intend them to be binding, a contract is formed even though they intend to adopt a formal document with additional terms at a later date." *Id.* (citations omitted). "As a general rule, signatures are not required unless such signing is expressly required by law or by the intent of the parties." *Id.* (citations omitted). In addition, "an offer may be accepted by conduct and what the parties d[o] pursuant to th[e] offer is germane to show whether the offer is accepted." *Schreiber v. Olan Mills*, 426 Pa.Super. 537, 541–42, 627 A.2d 806, 808 (1993) (citation omitted).

■■■ ¶ 10 Herein, we find sufficient evidence to support the Chancellor's finding that the parties entered into a binding contract. Although the parties did not sign either of the February memoranda, the conduct of the parties evidenced the formation of a contract in accordance with the terms of the revised February memorandum. The first detail we find highly indicative of the formation of a contract is the fact that appellee's salary changed on the specific date and in the specific manner set forth by the revised memorandum. This change in appellee's salary continued from March 25, 1985 until appellee's resignation in 1988. As stipulated by the parties, the reduction in appellee's salary amounted to $51,668.26.

¶ 11 In further accord with the revised memorandum, Sam Colletts took over appellee's duties in Boston, Massachusetts,

---

**2.** "The court in any action brought under this section shall, in addition to any judgment awarded ... allow costs for reasonable attorneys' fees of any nature to be paid by the defendant." 43 P.S. § 260.9a(f).

but resigned shortly thereafter. Mr. Colletts was eventually replaced. As a result of Mr. Colletts resignation, Mr. Baker sent a memorandum to appellee on October 7, 1985 that indicates, in relevant part, the existence of a contract:

> Please respond in writing what your present pay package consists of in light of Sam's recent resignation. There were some changes to your package at the implementation of Sam's job description and I presume that is still in effect since it was necessary for me to step in with Sam's absence.

(N.T. 2/19/98, at 33–34). Appellee testified that the parties did not address his pay structure again until 1988. (N.T. 2/19/98, at 34–44). In another memorandum sent by Mr. Baker to appellee, dated September 26, 1988, it referenced the "February 1985 agreement" and concluded by stating "[p]lease let me know if you agree that Sam's resignation cancelled the agreement." (N.T. 2/19/98, at 28–29). Clearly, Mr. Baker's own actions and statements indicated the existence of a contract.

¶ 12 Furthermore, we reject appellants' argument that a contract was not formed due to lack of consideration. As evidenced by the testimony of both appellee and Mr. Baker, every change in appellee's salary, with the exception of the last change in March 1989, was the product of a bilateral agreement. (N.T. 2/19/98, at 100–101; 132–133). We find that the Chancellor was provided with ample evidence to conclude that the reduction in appellee's salary constituted the consideration for his equity interest. In addition, we reject appellants' argument that appellee's equity interest "was far too speculatively defined" to constitute a contract. "It is hornbook law that in determining the intent of the parties, ambiguities are to be construed against … the contract drafter." *Shovel Transfer and Storage, Inc.*, 739 A.2d at 139. Construing the ambiguity of the equity interest against appellants, the Chancellor was able to value the equity interest as the reduction in appellee's in-

come. *See Biddle v. Johnsonbaugh*, 444 Pa.Super. 450, 458, 664 A.2d 159, 163 (1995)("an agreement is definite if it indicates that parties intended to make a contract and if there is an appropriate basis upon which a court can fashion a remedy").

¶ 13 Before addressing appellants' arguments concerning the WPCL, we consider it worthwhile to set forth the statute's purpose and focus. "Pennsylvania enacted the WPCL to provide a vehicle for employees to enforce payment of their wages and compensation held by their employers." *Oberneder v. Link Computer Corp.*, 449 Pa.Super. 528, 530–31, 674 A.2d 720, 721 (1996), affirmed, 548 Pa. 201, 696 A.2d 148 (1997). "[T]he underlying purpose of the WPCL is to remove some of the obstacles employees face in litigation by providing them with a statutory remedy when an employer breaches its contractual obligation to pay wages." *Id.*, 674 A.2d at 722. The WPCL "does not create an employee's substantive right to compensation; rather, it only establishes an employee's right to enforce payment of wages and compensation to which an employee is otherwise entitled by the terms of an agreement." *Banks Engineering Co., Inc. v. Polons*, 697 A.2d 1020, 1024 (Pa.Super.1997), appeal granted, 550 Pa. 715, 706 A.2d 1210 (1998) (citation omitted).

¶ 14 We now address appellants' argument that the equity interest contemplated by the parties did not constitute "wages" within the WPCL. The WPCL defines "wages" as the following:

> "**Wages.**" Includes all earnings of an employe, regardless of whether determined on time, task, piece, commission or other method of calculation. The term "wages" also includes *fringe benefits or wage supplements* whether payable by the employer from his funds or from amounts withheld from the employes' pay by the employer.

43 P.S. § 260.2a (emphasis added). Fringe benefits or wage supplements are defined as follows:

"Fringe benefits or wage supplements." Includes all monetary employer payments to provide benefits under any employe benefit plan, as defined in section 3(3) of the Employee Retirement Income Security Act ...; as well as separation, vacation, holiday, or guaranteed pay; reimbursement for expenses; union dues withheld from the employes' pay by the employer; and any other amount to be paid pursuant to an agreement to the employe, a third party or fund for the benefit of employes.

*Id.* (emphasis added). In addition, the Pennsylvania rules of statutory construction require the civil provisions of the WPCL to be liberally construed. *See* 1 Pa.C.S.A. § 1928(c).

¶ 15 Since the courts of Pennsylvania have had little opportunity to apply the above-mentioned definitions, we look to the federal bench for guidance. In the case of *Bowers v. NETI Technologies, Inc.,* 690 F.Supp. 349 (E.D.Pa.1988), the plaintiff had entered into a stock repurchase agreement with his former employer. At trial, the employer argued that the stock repurchase agreement did not constitute "wages" as set forth in the WPCL. In rejecting the employer's argument, the district court stated the following:

Like other fringe benefits, which are offered to employees when they first join a company, the stock repurchase payments were not provided to the employees on a weekly basis. Nevertheless, they were certainly "wages" within the broad definition of the WPCL in that they were payments pursuant to agreement, and they were offered to plaintiffs as employees, and not for some reason entirely unrelated to their employment by Phoenix.

*Bowers,* 690 F.Supp. at 353. This reasoning is equally applicable to the present case.

¶ 16 Like the plaintiff in *Bowers, supra,* the equity interest offered to appellee was payment pursuant to a binding agreement. As we stated previously, the equity interest was provided in exchange for a reduction in appellee's pay structure. This equity interest was offered to appellee as an employee, not for some reason unrelated to his employment with appellants. *See Bowers, supra.* Thus, pursuant to a liberal construction of § 260.2a of the WPCL and the reasoning in *Bowers, supra,* we agree with the Chancellor's determination that appellee's equity interest constitutes "wages" as defined by the WPCL.

¶ 17 We now address appellants' arguments concerning § 260.10 of the WPCL which states the following:

Where wages remain unpaid for thirty days beyond the regularly scheduled payday, or, in the case where no regularly scheduled payday is applicable, for sixty days beyond the filing by the employe of a proper claim or for sixty days beyond the date of the agreement, award or other act making wages payable ... and no good faith contest or dispute of any wage claim including the good faith assertion of a right of set-off or counter-claim exists accounting for such non-payment, the employe shall be entitled to claim, in addition, as liquidated damages an amount equal to twenty-five percent (25%) of the total amount of wages due, or five hundred dollars ($500), whichever is greater.

43 P.S. § 260.10. Appellants allege that the Chancellor committed two errors in its interpretation of this section. First, appellants argue that the Chancellor incorrectly placed the burden of proving the existence of a "good faith" contest, dispute, claim of set-off or counterclaim on the employer. Second, appellants argue that the Chancellor incorrectly determined the standard of proof in demonstrating good faith to be that of clear and convincing evidence. For purposes of our analysis, we will assume that appellants bore the burden of proof and focus upon the standard of proof required.

¶ 18 After determining that appellants bore the burden of proof, the Chancellor correctly observed that neither the WPCL nor the case law applying the WPCL address the level of proof required to demonstrate good faith. In seeking an answer, the Chancellor equated the proving of good faith by a defendant to the proving of bad faith by a plaintiff. Unlike appellants, we do not find the Chancellor's conclusion erroneous. Although the lack of good faith is not completely synonymous with bad faith, we find enough similarity between these terms to have allowed the Chancellor to look to cases construing the term bad faith in an effort to determine the level of proof required to show good faith under the WPCL.[3] The Chancellor utilized the numerous insurance law cases involving claims of bad faith on the part of the insurer. We agree with the Chancellor's finding, in light of the insurance bad faith case law, that good faith must be proven by clear and convincing evidence. Cf. MGA Ins. Co. v. Bakos, 699 A.2d 751, 754 (Pa.Super.1997)("[a] recovery for bad faith requires clear and convincing evidence of bad faith, rather than a mere insinuation, and a showing by the insured that the insurer did not have a reasonable basis for denying benefits ... or recklessly disregarded its lack of a reasonable basis in denying the claim").[4]

¶ 19 Finally, we address appellants' argument that the Chancellor erred in finding that appellants did not behave in good faith by disputing the obligation to pay appellee the sought after wages. After applying the "clear and convincing evidence standard" to appellants' actions, we find that the Chancellor erred on its conclusion. In the insurance context, "mere negligence or bad judgment is not bad faith." MGA Ins. Co., 699 A.2d at 754 (citations omitted). The case of Collins v. Allstate Indem. Co., 426 Pa.Super. 197, 626 A.2d 1162 (1993), contains reasoning that illustrates our conclusion. The Collins case involved a claim for attorney's fees pursuant to section 1009.107(3) of the No–Fault Act,[5] which was based upon the alleged bad faith of insurers. In the Collins case, the insurer governed its behavior in accordance with an incorrect interpretation of state and federal statutes and regulations. Collins, 626 A.2d at 1171. However, we found that such behavior did not constitute bad faith since the "insurers litigated a non-frivolous issue ... and presented authority to support their theories." Id. "Although their interpretations were incorrect, their arguments apparently were made in good faith." Id.

¶ 20 Herein, appellants governed their behavior based upon an incor-

---

3. "Good faith" is defined as "[a] state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, (3) observance of reasonable commercial standards of fair dealing in a given trade or business, or (4) absence of intent to defraud or to seek unconscionable advantage. Black's Law Dictionary (7 th ed.1999), at 701.

"Bad faith" in the insurance context is defined as "[a]n insurance company's unreasonable and unfounded (though not necessarily fraudulent) refusal to provide coverage in violation of the duties of good faith and fair dealing owed to an insured." Black's Law Dictionary (7 th ed.1999), at 134 (emphasis added).

4. We briefly address appellants' argument that the Chancellor erred by failing to vacate the adjudication and decree nisi as well as to recuse itself from the present case. Appellants stated that the Chancellor's clerk repre-sented a former employee in a WPCL claim while working for the Chancellor during the present case. Appellants allege that the judicial clerk improperly influenced the Chancellor in relation to the standard of proof required for liquidated damages under the WPCL. Appellants claim that the judicial clerk influenced the Chancellor in order to benefit his private practice client.

Even assuming that the Chancellor was indeed influenced by his judicial clerk, appellants only allege an error of law. We provided appellants with plenary review of the Chancellor's legal rulings. In addition, our finding of error on the part of the Chancellor, concerning the issue of liquidated damages under the WPCL, eliminated any prejudice that appellants alleged to have suffered at trial.

5. 40 Pa.C.S.A. §§ 1009.101 et seq. (repealed).

rect understanding of the binding nature of the revised February memorandum and an incorrect interpretation of the WPCL, whereby appellants believed the equity interest did not constitute "wages". We find that the record provided appellants with sufficient reason to dispute appellee's claim that the parties were bound by the terms of the revised memorandum and that appellee was entitled to payment of the equity interest in the form of wages under the WPCL. The following facts and averments demonstrate that appellants' misunderstanding was reasonable and not indicative of bad faith:

1. The parties never signed a document reflecting appellee's revised pay structure.

2. The accounting system to determine the percentage of the equity interest was not defined by the revised February memorandum.

3. Due to the absence of a defined accounting system, appellant believed that no value could be placed on appellee's equity interest and that, accordingly, this interest did not qualify as "wages" under the WPCL.

4. Appellee's testimony that, prior to his decision to exercise his equity interest and resign, both parties had set forth opposing points of view regarding the binding nature of the revised February memorandum. (N.T. 2/19/98, at 93–95).

5. Appellant's belief that the resignation of Sam Colletts maẙ have cancelled any agreement reached by the parties concerning appellee's revised pay structure. (N.T. 2/19/98, at 27–29).

Similar to the insurers in *Collins, supra,* appellants made an incorrect legal conclusion in good faith that was based upon supportive authority and a thorough examination of the parties' course of conduct. As we found in the insurance context that mere bad judgment is not bad faith, so to do we find that mere bad judgment does not prevent an employer from acting in good faith under the WPCL. *Cf. MGA Ins. Co., supra.* Thus, we find that the Chancellor erred by finding that appellants failed to prove that they acted in good faith by disputing appellee's claim for payment.[6]

¶ 21 For the foregoing reasons, we affirm the portion of the final decree that awarded appellee $51,668.26 and interest in the amount of $27,900 based upon the finding that a contract existed and that the equity interest described in the contract constituted wages under § 260.2a of the WPCL. Moreover, we affirm the award of attorneys' fees in the amount of $30,828.74. However, we find that the Chancellor erred in finding that appellants did not act in good faith and that appellee was entitled to liquidated damages pursuant to § 260.10 of the WPCL. Accordingly, we vacate the portion of the final decree that awarded liquidated damages in the amount of $12,917.07.

¶ 22 Affirmed in part. Vacated in part. Jurisdiction relinquished.

---

**6.** Although the Chancellor stated that appellants were denied the benefit of a good faith defense due to the fact that appellants failed to pay appellee $222.86 for work done on a particular project, we find this conclusion far overreaching. Even assuming appellants did not act in good faith when they refused to pay the $222.86, we fail to see any connection to the present dispute in which the parties pos-

sessed varying interpretations of a memorandum. Simply because an employer failed to prove that it acted in good faith in one particular episode of disputed wages, does not deny the employer the benefit of a good faith defense under the WPCL in a subsequent wage dispute involving a different set of circumstances with the same employee.