The MUNICIPAL AUTHORITY OF the
BOROUGH OF EDGEWORTH

v.

BOROUGH OF AMBRIDGE WATER
AUTHORITY, Appellant.

Commonwealth Court of Pennsylvania.

Argued Oct. 10, 2007.

Decided Nov. 1, 2007.

Reargument Denied Dec. 28, 2007.

Andrew M. Hladio, Ambridge, for appellant.

Brendan G. Stuhan, Pittsburgh, for appellee.

BEFORE: FRIEDMAN, Judge, COHN JUBELIRER, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge FRIEDMAN.

The Borough of Ambridge Water Authority (Ambridge) appeals from the January 2, 2007, order of the Court of Common Pleas of Allegheny County (trial court) denying Ambridge's motion for post-trial relief following entry of the trial court's October 13, 2006, order granting declaratory relief to the Municipal Authority of the Borough of Edgeworth (Edgeworth).

Edgeworth and Ambridge are both municipal authorities organized for the purpose of furnishing public water service to various residential and commercial users. Until 2001, Edgeworth treated and supplied water to its residents through its own facilities. However, in 1997, the Pennsylvania Department of Environmental Protection (DEP) determined that Edgeworth's water treatment plant was violating federal standards for waste water discharges, and, under a consent order and agreement (CO & A) with DEP, Edgeworth agreed to remedy those violations on a schedule of milestones imposed by DEP. Accordingly, the Edgeworth Board of Directors (Edgeworth Board) authorized Edgeworth's Supervising Engineer, David Kerchner, to begin exploring various options for compliance with the CO & A. Kerchner considered the possibility of Edgeworth constructing its own compliant waste water treatment facilities as well as the possibility of Edgeworth purchasing water in bulk from another water supplier.

In November 1997, Kerchner asked Timothy Brown, Ambridge's General Manager, about the cost of purchasing water from Ambridge. Edgeworth declined Ambridge's initial bid of $2.00 per 1,000 gallons of water, concluding that it would be more cost effective in the long term for Edgeworth simply to construct its own facilities. However, Ambridge was ex-

tremely interested in providing bulk water to Edgeworth,[1] and Ambridge's Board of Directors (Ambridge Board) authorized Brown to offer bulk water to Edgeworth at a reduced price. In addition, Ambridge offered Edgeworth up to $140,000 so that Edgeworth could make changes to the physical interconnect structures that would be necessary to allow Edgeworth to receive these large volumes of water from Ambridge.

After further negotiations, the Edgeworth and Ambridge Boards resolved to enter into an agreement, and, on September 4, 1998, the Ambridge Board authorized Brown to submit a "Letter of Intent" to Edgeworth, agreeing, in relevant part, as follows:

1. Ambridge will commit the necessary resources from its source of water supply to provide the full daily water supply requirements of Edgeworth.

2. Upon signing a formal agreement having: (a) a minimum initial term of Twenty (20) Years; (b) Specifying the following prices for water: Years 1–5, $1.50 per 1,000 gallons; Years 6–10, $1.65 per 1,000 gallons; Years 11–15, $1.80 per 1,000 gallons; and Years 16–20, $2.00 per 1,000 gallons.

(Ex. 14, R.R. at 375.) On behalf of Edgeworth, Kerchner sent a reciprocal "Letter of Intent" to Ambridge on October 7, 1998. (Ex. 17, R.R. at 383–85.) In each of these letters of intent, the parties set forth the same price structure to cover the entire initial twenty-year term, with prices established for four five-year periods.

Thereafter, the parties began exchanging draft agreements. The first two draft agreements proposed by Brown on behalf of Ambridge in September and October 1998, respectively, contained the following language:

This agreement shall become effective from the date written first above, and shall continue in effect for a period of twenty (20) years from the last day of the month during which Edgeworth begins to receive its entire daily water supply requirement from Ambridge, or August 31, 1999, whichever is sooner.

(Ex. 18, R.R. at 386; Ex. 19, R.R. at 393.) Thus, in the draft agreements, Ambridge proposed language that would begin the initial twenty-year term no later than August 31, 1999. Consistent with this proposed 1999 start date, the second draft agreement also added pricing "Schedule A", which provided:

## SCHEDULE A

During the term of the Agreement, the following prices shall be paid by Edgeworth to Ambridge for the purchase of water, as specified in the Agreement.

Years 1 through 5, beginning on the starting date of the Agreement 1999:

**$1.50 per 1,000 gallons of water.**

Years 6 through 10, beginning on the fifth (5th) anniversary date of the Agreement in 2004;

**$1.65 per 1,000 gallons of water.**

Years 11 through 15, beginning on the tenth (10th) anniversary date of the Agreement in 2009;

**$1.80 per 1,000 gallons of water.**

Years 16 through 20, beginning on the fifteenth (15th) anniversary date of the Agreement in 2014;

1. Ambridge had a substantial overcapacity and, actually, was treating and then dumping large volumes of water into the Ohio River. By supplying water to Edgeworth, Ambridge would receive revenue for something that previously provided it with no benefit, and Ambridge also would avoid threatened DEP actions against it for dumping this treated water into the river.

**$2.00 per 1,000 gallons of water.**

(Ex. 19, R.R. at 399.)

Because there were matters beyond Edgeworth's control that could determine when the water would begin to flow from Ambridge,[2] Edgeworth was uncomfortable with the August 31, 1999, deadline and countered with a proposed draft agreement to Ambridge that deleted the language "or August 31, 1999, whichever is sooner." (Ex. 19, R.R. at 393.) Ambridge agreed to Edgeworth's deletion, thereby setting commencement of the initial twenty-year contract period at the time when Ambridge actually began to supply Edgeworth's daily water requirements, whenever that date would be.

Thus, paragraph 2 of the final agreement (Agreement) signed by the parties on December 8, 1998, contained the following relevant language:

2. This agreement shall become effective from the date written first above [i.e., December 8, 1998] and shall continue in full force and effect for a period of twenty (20) years *commencing from the last day of the month when Edgeworth begins to receive its daily water supply requirement from Ambridge* (hereinafter the "Initial Term").

(Ex. 1, R.R. at 322) (emphasis added). The final Agreement also incorporated Schedule A; paragraph 10 of the Agreement states, in relevant part, "Ambridge agrees to charge Edgeworth and Edgeworth agrees to pay Ambridge for water supplied and received pursuant to the terms and conditions of this Agreement in accordance with Rate Schedule A, which is attached hereto and made a part hereof."[3] (Ex. 1, R.R. at 323.) However, despite the changes to paragraph 2 of the Agreement, Schedule A remained unchanged and still contained the reference to "1999" and other specific years, consistent with the now deleted August 31, 1999, deadline.

Edgeworth finally completed construction of the needed interconnect improvements and began receiving its daily water supply from Ambridge in January of 2001, making January 31, 2001, the commencement date of the Agreement's Initial Term. Pursuant to the Agreement, Edgeworth paid Ambridge $1.50 per 1,000 gallons of water without incident until 2003. By this time, Brown had been replaced as General Manager of Ambridge by Mary Hrotic, who took the position that the "1999" in Schedule A should be interpreted as establishing the start date for price rates under the Agreement as January 1, 1999. Under this interpretation of the Agreement by Ambridge, Edgeworth would be subject to a price increase as of January 1, 2004, rather than January 31, 2006. Also, under Ambridge's interpretation, Schedule A would establish no price under the Agreement for any water Edgeworth receives in the final two years of the Agreement's twenty-year Initial Term.

Hrotic communicated her interpretation of the Agreement to Edgeworth in September 2003. (Ex. 64, R.R. at 486.) By letter dated December 5, 2003, Edgeworth's solicitor responded by pointing to the language in paragraph 2 of the Agreement, which he believed established that

2. For example, the physical facilities might take longer than expected to construct. Also, water was not allowed to flow until DEP issued all required permits, and the date of permit issuance was beyond either of the parties' control.

3. Both Kerchner and Brown testified that they understood the deletion of the 1999 limitation in paragraph 2 of the Agreement to mean that the twenty-year Initial Term, *and the corresponding starting date of the four-term rate set forth in Schedule A,* would not begin until the water began to flow. (R.R. at 131, 251–52, 260–65, 288.)

the first five-year price term (and corresponding $1.50 rate) did not commence until January of 2001. Edgeworth recognized that the Agreement did not address dispute resolution in this situation but noted that paragraph 13 of the Agreement provided for the deposit of disputed amounts into an escrow account. Edgeworth further urged an amicable resolution to the matter and offered to meet with representatives of Ambridge. (Ex. 65, R.R. at 488–89.)

Nevertheless, beginning with the water supplied in January 2004, Ambridge began billing Edgeworth at the $1.65 per 1,000 gallon rate. By letter dated February 16, 2004, Edgeworth notified Ambridge that it was disputing the rate and would pay the $0.15 cent difference into an escrow account pending resolution of the dispute.[4] (Ex. 66, R.R. at 490.)

On February 13, 2004, Edgeworth filed a Complaint for Declaratory Relief, seeking to have the trial court interpret the Agreement. (R.R. at 527–33.) Ambridge filed an answer, new matter and counterclaim.[5] (R.R. at 548–53.) Prior to trial,

Ambridge filed a motion in limine seeking to preclude the court's consideration of extrinsic evidence. Ambridge asserted that the Agreement is not ambiguous with regard to the price term being tied to the specific years listed in Schedule A, that the Agreement and all prior drafts included an integration clause, and that, therefore, the parol evidence rule bars Edgeworth from presenting any evidence of prior oral or written negotiations or agreements. (R.R. at 579.) The trial court denied the motion in limine. (R.R. at 27.)

A two-day, non-jury trial was held on September 20, 2006, and September 25, 2006. In addition to documentary evidence, Edgeworth presented the testimony of Kerchner and Brown with respect to the parties' understanding of the Agreement.[6] On October 13, 2006, the trial court entered an order in favor of Edgeworth, concluding that the starting date for *both* the twenty-year Initial Term of the Agreement *and* the twenty-year pricing structure in Schedule A was whenever water began to flow, in this case January 31, 2001.[7]

---

4. Edgeworth made these deposits until January 2006, when it began paying Ambridge at the rate of $1.65 per 1,000 gallons pursuant to the terms of the Agreement as interpreted by Edgeworth.

5. Subsequently, Edgeworth filed an answer to Ambridge's new matter and counterclaim, (R.R. at 555–59), and requested leave to amend its Complaint for Declaratory Relief to add a reformation claim as alternative grounds for relief. (R.R. at 563–76.) Both parties also submitted motions for summary judgment, which were denied.

6. Edgeworth also presented the testimony of Edgeworth General Manager, William Easton, and Hrotic. Ambridge presented the testimony of its Engineer, Frank Lemmon.

7. In its entirety, the trial court's October 13, 2006, order provided:

1. Judgment is entered in favor of Edgeworth and against Ambridge on Ambridge's Counterclaim.
2. Judgment is entered in favor of Edgeworth and against Ambridge on Edgeworth's Complaint, as follows:
 a. The terms of Schedule A of the Agreement between Edgeworth and Ambridge which was entered into on December 8, 1998, are modified to read as follows:
Years 1 through 5, beginning on the starting date of the Agreement, January 31, 2001: $1.50 per 1,000 gallons of water; Years 6 through 10, beginning on the fifth (5th) anniversary date of the Agreement, January 31, 2006: $1.65 per 1,000 gallons of water; Years 11 through 15, beginning on the tenth (10th) anniversary date of the Agreement, January 31, 2011: $1.80 per 1,000 gallons of water; Years 16 through 20, beginning on the fifteenth (15th) anniversary date of the Agreement, January 31, 2016: $2.00 per 1,000 gallons of water.

The trial court derived its interpretation initially "[f]rom an examination of the four corners" of the Agreement. (Trial ct. op at 6, R.R. at 591.) Alternatively, the trial court held that even "*if* the inclusion of '1999' and other specific years in Schedule A, should be said to create an ambiguity," it derived the same interpretation from consideration of "the background and history of the transaction, the subject matter, the apparent object or purpose of the parties and the surrounding circumstances in general." (*Id.*, emphasis added.) Ambridge filed a motion for post-trial relief requesting either judgment in its favor or a new trial. (R.R. at 596–99.) The trial

court denied Ambridge's motion on January 2, 2007, (R.R. at 604), and Ambridge now appeals to this court.[8]

▮ Ambridge first argues that the Agreement was not ambiguous, and, therefore, the trial court erred in looking beyond the four corners of the Agreement for its interpretation.[9] Focusing on the specific years mentioned in Schedule A and the Agreement's integration clause, Ambridge argues that the Agreement is unambiguous.[10]

Ambridge notes that Schedule A expressly ties the price terms to the years listed but makes no mention of a water supply date;[11] similarly, Ambridge points

---

b. Edgeworth is entitled to possession of all funds it has deposited into the Edgeworth Borough Municipal Authority Escrow Fund at Citizens Bank.
3. Edgeworth is awarded the costs of the suit.
(R.R. at 593–94.)

8. Ambridge originally filed its appeal in the Superior Court; however, upon request by Edgeworth, the matter subsequently was transferred to this court. This court's scope of review of a trial court's denial of post-trial motions is limited to determining whether the trial court abused its discretion or committed an error of law. *Ford ex rel. Pringle v. Philadelphia Housing Authority*, 848 A.2d 1038 (Pa. Cmwlth.2004), *appeal dismissed*, 583 Pa. 439, 879 A.2d 162 (2005).

9. Contrary to Ambridge's contention, the trial court *did* make a ruling in favor of Edgeworth based *solely* on the Agreement itself. Recognizing this, Edgeworth argues as a threshold matter that we should dismiss the first two issues raised in Ambridge's appeal as moot. Specifically, Edgeworth contends that Ambridge has waived any objection to the trial court's interpretation of the Agreement *on its face* by failing to acknowledge this explicit holding or to allege it as error in post-trial motions. *Taylor v. City of Philadelphia*, 692 A.2d 308 (Pa.Cmwlth.) (holding that litigants must raise all allegations of error on post-trial motions or they will be deemed waived on appeal), *aff'd*, 548 Pa. 568, 699 A.2d 730 (1997). Edgeworth asserts that, absent a challenge to the trial court's ruling that Edge-

worth is entitled to judgment *based on an examination of the four corners of the Agreement*, the first two issues raised by Ambridge are moot because they both relate to the trial court's *alternative* grounds for ruling in favor of Edgeworth *if* the Agreement were ambiguous. However, because we conclude that an objection to the trial court's interpretation of the Agreement on its face is fairly subsumed within Ambridge's motion for post-trial relief, we will address the issues Ambridge raises regarding contract interpretation.

10. In interpreting a contract, the court's goal is to ascertain the intent of the parties as manifested by the language of the written agreement. *Standard Venetian Blind Co. v. American Empire Insurance Co.*, 503 Pa. 300, 469 A.2d 563 (1983). Here, Edgeworth maintains that the trial court properly ruled in its favor based *solely* on the language in the Agreement; however, unlike the trial court, we are not convinced that the language of the Agreement itself *unambiguously dictates* that the prices contained in Schedule A begin to apply in 2001 rather than 1999.

11. Ambridge attaches great importance to testimony by Kerchner in which he explains that he focused on the body of the Agreement and, therefore, failed to read Schedule A. According to Ambridge, Kerchner's statement either is incorrect or, alternatively, cannot justify Edgeworth's avoidance or alteration of a clear contract provision. Although we agree that Kerchner offers an inadequate excuse for

out that paragraph 2 of the Agreement sets a twenty-year Initial Term but is silent when it comes to tying the prices and years in Schedule A to that twenty-year period.

 Ambridge also emphasizes the fact that paragraph 28 of the Agreement contains an integration clause, thereby establishing that the Agreement represents the entire understanding between the parties and supersedes any prior understanding or agreements. (R.R. at 327.) Consequently, Ambridge contends that the parol evidence rule applies, and the trial court should not have admitted or considered evidence of prior negotiations or agreements to vary the terms of the Agreement.[12] Ambridge asserts that if the trial court had properly confined its analysis to the four corners of the Agreement, it would, or should, have entered judgment in favor of Ambridge.

However, Ambridge ignores other language in Schedule A and in paragraphs 2 and 10 of the Agreement. Paragraph 2 clearly states that the twenty-year Initial Term of the Agreement *commences* when Edgeworth begins to receive water from Ambridge, in this case 2001. Paragraph 10 provides that Ambridge will charge, and *Edgeworth will pay, for water supplied and received* pursuant to the Agreement *in accordance with Schedule A.* Finally, Schedule A expressly provides that Years 1 through 5 begin on the *starting date* of the Agreement, Years 6 through 10 begin on the fifth *anniversary date* of the Agreement, Years 11 through 15 begin on the tenth *anniversary date* of the Agreement and Years 16 through 20 begin on the fifteenth *anniversary date* of the Agreement. Taken together, these provisions indicate that the parties intended Schedule A's twenty-year rate schedule to cover the *entire* twenty-year Initial Term. However, the inclusion of "1999" and other specific years in Schedule A makes that impossible,[13] thereby creating ambiguity in the Agreement. *See Charles D. Stein Revocable Trust v. General Felt Industries, Inc.,* 749 A.2d 978 (Pa.Super.) (stating that one part of a contract cannot be interpreted so as to annul another part; rather, writings which comprise an agreement must be interpreted as a whole), *appeal denied,* 563

overlooking the reference to specific years in Schedule A, we disagree that Kerchner's oversight, or the reason behind it, is relevant to the issue facing the trial court, i.e., interpretation of the Agreement.

12. Explaining the parol evidence rule, our supreme court has stated that, where the parties, without fraud or mistake, deliberately put their engagements in writing, that writing is the only evidence of their agreement, and all preliminary negotiations, conversations and verbal agreements are merged into and superseded by the subsequent written contract. *Yocca v. Pittsburgh Steelers Sports, Inc.,* 578 Pa. 479, 854 A.2d 425 (2004). Moreover, an integration clause which states that a writing is meant to represent the parties' entire agreement is a clear sign that the writing is meant to be just that, expressing all the parties' negotiations, conversations and agreements made prior to its execution. *Id.*

Thus, once a writing is determined to be the parties' entire contract, the parol evidence rule applies, and evidence of previous oral or written negotiations or agreements involving the same subject matter is almost always inadmissible to explain or vary the contract terms. *Id.* However, parol evidence may be introduced to vary a writing meant to be the parties' entire contract where a party avers that a term was omitted because of fraud, accident or mistake. In addition, where a term in the parties' contract is ambiguous, parol evidence is admissible to explain or clarify or resolve the ambiguity. *Id.*

13. Under Ambridge's interpretation, the Initial Term of the Agreement extends from January 2001 through December 2020, whereas Schedule A extends from January 1999 through December 2018, omitting price rates for the 19th and 20th years of the Initial Term.

Pa. 697, 761 A.2d 547 (2000). Thus, notwithstanding the Agreement's integration clause, the trial court properly admitted and considered parol evidence to aid in interpreting the Agreement so it would reflect the understanding and intent of the parties at the time they entered the Agreement. *Yocca v. Pittsburgh Steelers Sports, Inc.*, 578 Pa. 479, 854 A.2d 425 (2004) (holding that an integration clause does not bar evidence of prior negotiations and conversations if the contract is ambiguous).

■ Next, Ambridge argues that, even if the Agreement is ambiguous, Edgeworth did not provide the trial court with sufficient, valid evidence to find in favor of Edgeworth. To the contrary, Ambridge contends that the facts and circumstances existing at the time of signing clearly demonstrate that the trial court should have interpreted the Agreement in Ambridge's favor. We disagree.

Ambridge argues that Edgeworth's evidence is insufficient to support the trial court's ruling because Edgeworth presented no testimony from any members of the Edgeworth or Ambridge Board regarding their understanding of the Agreement; instead, Edgeworth offered only Kerchner and Brown as witnesses, and both acknowledged that they can only make recommendations to their respective municipal boards. According to Ambridge, there is every reason to believe that the Board members read and understood the Agreement to include the 1999 start date in Schedule A. Ambridge also contends that, to the extent there is an ambiguity in Schedule A, the solution is not to delete the specific years and rewrite the Agreement; rather, the court should insert a reasonable price for years 19 and 20. We are not persuaded by this argument.

Ambridge cites no authority for its assertion that only testimony from Board members is relevant to the parties' contractual intentions. In fact, there is legal authority to the contrary. *See Shipley v. Pittsburgh & L.E.R. Co.*, 83 F.Supp. 722 (W.D.Pa.1949) (holding that the testimony from representatives of the bargaining agency who took part in negotiating a contract was relevant to assist the court in ascertaining the intent of the parties and the terms of the contract even when the representatives were not parties to the contract); *General Electric Credit Corp. v. Aetna Casualty and Surety Co.*, 437 Pa. 463, 263 A.2d 448 (1970) (concluding that the testimony of a company's agent alone was sufficient to establish the company's contractual intent).

Here, Kerchner, who represented Edgeworth in contract negotiations, and Brown, who did the same for Ambridge, both testified regarding the intent and circumstances behind the Agreement. Not only did they corroborate each other, but their testimony also was corroborated by the documentary evidence. In particular, in the "Letters of Intent" issued by Edgeworth and Ambridge, each party agreed that the rates for the initial twenty-year term would be divided into four five-year periods, without identifying a specific year as "year one." Moreover, although Ambridge subsequently inserted the year 1999 into paragraph 2 of its draft agreement, this year was expressly deleted in the parties' final Agreement. The trial court properly considered this documentary evidence and the testimony of the duly appointed agents of Edgeworth and Ambridge in ascertaining the parties' intentions, and, as fact-finder, the trial court had discretion to give this evidence the weight it deemed appropriate. We conclude that this evidence supports the trial court's ruling in Edgeworth's favor.

Having offered no evidence in rebuttal, Ambridge simply asserts on appeal that it

would be absurd to tie the price rates in Schedule A to an unknown date when water was supplied because "if water was supplied in the year 2010, Ambridge would be stuck with charging $1.50 per 1,000 gallons of water in the year 2010." (Ambridge's brief at 20.) According to Ambridge, a municipality must tie its prices to costs in order to sustain its budget, and, therefore, the law does not support this absurd result. However, Ambridge ignores Brown's testimony that, in negotiating rates for the Agreement, Ambridge *never intended* to tie its rates to costs. In fact, Brown testified that Ambridge intentionally proposed lower prices (based on an industrial rate) to entice Edgeworth to contract with Ambridge because Ambridge recognized that it was receiving no revenue at all from its vast oversupply of treated water but, in fact, was virtually throwing that water away. (R.R. at 231–37.)

■ Next, Ambridge argues that judgment should be entered in its favor because Edgeworth did not submit a letter of complaint to it for the January 2004 bill [14] until February 16, 2004. Ambridge argues that this is a violation of Paragraph 13 of the Agreement, which requires that Edgeworth give Ambridge ten days written notice of any contested bill.[15] Ambridge maintains that because Edgeworth failed to satisfy this "condition precedent" to properly contest the bill, it should not be permitted to do so now. Again, we disagree.

First, like the trial court, we conclude that paragraph 13 of the Agreement is not implicated here because this dispute is not a challenge to a monthly water bill. As the trial court explained, "[t]his is not a situation, for example, where Edgeworth is complaining that it was charged in a particular month for more water than it received. Rather, the dispute here goes to the fundamental interpretation of the entire [Agreement]." (Trial ct. op. at 7, R.R. at 592.) Moreover, Ambridge was well aware of Edgeworth's position opposing the rate increase; Edgeworth notified Ambridge of this in its response letter to Hrotic, dated December 5, 2003, well before the 2004 bill. Finally, we agree with Edgeworth, that by failing to object to the alleged untimely notice for more than two years, Ambridge waived any objection to the notice provided by Edgeworth.

■ Alternatively, Ambridge argues that the Agreement itself should be voidable. Ambridge points out that, because the Agreement covers a twenty-year period, it necessarily binds successive members of the Edgeworth and Ambridge Boards, whose terms are five years. According to Ambridge, the Agreement here involves performance of a governmental, rather than proprietary, function and so cannot extend beyond the time when the officials who entered the contract are in office. Ambridge maintains that a successor Board should be allowed to terminate the Agreement without cause irrespective

**14.** Ambridge asserts that, in paragraph 17 of its Complaint, Edgeworth admits that it received its first bill with the new rate increase in January of 2004. (R.R. at 51–52; 529.)

**15.** Paragraph 13 of the Agreement states, in relevant part:
The period of time elapsing between monthly readings shall constitute the monthly billing period. On or about the tenth day following the meter reading Ambridge will render a bill to Edgeworth or its duly authorized representative. Upon receipt of such bill, Edgeworth shall have ten (10) business days to contest the amount of such bill by providing Ambridge with written notice indicating the contested amount of the bill and the reasons for such contest.
(R.R. at 324.)

of the termination date or other procedure set forth in the contract. We disagree.

 Whether a governmental body may enter long-term contracts binding upon its successors turns on whether the contract serves a governmental or proprietary purpose. *Boyle v. Municipal Authority of Westmoreland County,* 796 A.2d 389 (Pa.Cmwlth.), *appeal denied,* 571 Pa. 709, 812 A.2d 1231 (2002). If the contract relates to a governmental function, it cannot bind successors; however, if the contract relates to a proprietary function, it can bind successors. *Id.; County of Butler v. Local 585, Service Employees International Union, AFL–CIO,* 158 Pa.Cmwlth. 519, 631 A.2d 1389 (1993). In determining whether activity is governmental or proprietary, the court will consider whether: (1) the activity is one that government is not statutorily required to perform; (2) the activity also may be carried on by private enterprise; or (3) the activity is used as a means of raising revenue. *Program Administration Services, Inc., v. Dauphin County General Authority,* 874 A.2d 722 (Pa.Cmwlth.2005), *aff'd,* 593 Pa. 184, 928 A.2d 1013 (2007); *Boyle; County of Butler.* If the answer to any of these inquiries is yes, the function is proprietary. *Boyle.* The activity involved in this case, the selling of bulk water by Ambridge to Edgeworth, meets all three prongs of this test. Further, it is long settled law that a municipal authority owning and operating a water supply system acts in its proprietary, not governmental, capacity. *In re Petition of City of Philadelphia,* 340 Pa. 17, 16 A.2d 32 (1940); *Boyle* (citing *Yezioro v. North Fayette County Municipal Authority,* 193 Pa.Super. 271, 164 A.2d 129 (1960)).

Accordingly, we affirm.

### ORDER

AND NOW, this 1st day of November, 2007, the order of the Court of Common Pleas of Allegheny County, dated January 2, 2007, is hereby affirmed.