**BEAVER DAM OUTDOORS CLUB**

v.

**HAZLETON CITY AUTHORITY,**
**Appellant.**

Commonwealth Court of Pennsylvania.

Argued Dec. 11, 2007.

Decided Feb. 20, 2008.

Reargument Denied April 10, 2008.

---

Peter P. O'Donnell, Hazleton, for appellant.

Thomas L. Kennedy, Hazleton, for appellee.

BEFORE: SMITH–RIBNER, Judge, and SIMPSON, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge SIMPSON.

We are asked to determine whether the Hazleton City Authority (Authority) entered into an enforceable lease with the Beaver Dam Outdoors Club (Club), a hunting and fishing club, for a multi-year lease of approximately 487 acres of the Authority's watershed property in Carbon County. Following a non-jury trial, the Carbon County Court of Common Pleas (trial court) entered declaratory judgment in favor of the Club. The trial court held the lease to be a valid and binding contract. For the following reasons, we affirm.

## I. Background

The Authority is a municipal authority created by the City of Hazleton for the purpose of providing water to municipalities in the Greater Hazleton area. The Authority's Board of Directors (Board) consists of five members.

The Club is a nonprofit corporation incorporated in 2001 for the purpose of promoting responsible use of natural resources.

At some point prior to the Club's incorporation, Andrew Sherkness (Club President), Carlo Collevechio (Club Secretary) and the Board's Vice Chairman Joe Zoba (Board Vice Chairman) began negotiating for a lease regarding three parcels of land the Authority owned in Packer Township, Carbon County. As a result of negotiations, Board Vice Chairman informed Club President he would present a motion to the

Board to approve a lease of the property if the Club formed a nonprofit corporation and obtained liability insurance for the land. Shortly thereafter, the Club was incorporated.

In August 2003, the Club obtained liability insurance for the property and named the Authority as an *additional insured*. Thereafter, the parties prepared a lease. With the exception of the metes and bounds description, the terms of the Club's lease were identical to four existing leases in place at the time between the Authority and similar hunting clubs.

At the Board's December 8, 2003 regular meeting, Board Vice Chairman made a motion to approve Resolution 123 in order to enter into the proposed lease. Prior to the vote on Resolution 123, Board Chairman Frank DeAndrea (Board Chairman) moved to suspend the rules in order to place Resolution 123 on the agenda even though the Board did not review the proposed lease at a prior work session. The motion to suspend the rules passed, and the Board voted on Resolution 123.

As reflected in the meeting minutes, Resolution 123 provided:

"Be it Resolved by [the Board], that a Lease be entered into between the [Authority and the Club] for the purpose of leasing a parcel or tract of land situated in Packer Township, Carbon County as more particularly described in said Lease Agreement. Be it further resolved, that the appropriate officers are authorized to sign, as such, any and all documents to effectuate the above lease agreement. That an opinion from the Authority's engineer as to the usefulness and necessity of the property as it relates to the water system be obtained

and notice of the lease agreement be forwarded to all parties of interest by the Solicitor."

Club Ex. No. 11; Reproduced Record (R.R.) at 578a.

A three-member majority voted to approve Resolution 123.[1] *Id.* One Board member voted against it, and another abstained. *Id.* The Board minority opposed the lease in part because the Board did not have the completed lease to review when it voted on Resolution 123.

Following the meeting, the parties signed the lease at the office of Solicitor Ned McNelis (Authority Solicitor). Board Chairman signed the lease on behalf of the Authority. Club President and Club Secretary signed for the Club. By its terms, the lease became effective immediately. Board Chairman's term of office expired at the end of December 2003, and he was replaced.

Ultimately, the Authority's manager, Randy Calahan (General Manager), informed the Club the lease was invalid. He returned the lease payments and the notice of insurance coverage.

Thereafter, the Club filed a two-count complaint for declaratory and equitable relief arising from an alleged breach of contract. In its declaratory judgment count, the Club averred the lease is in full force and effect, is unambiguous, and contains no contingencies preventing or limiting the Club's right to use the property. In its equity count, the Club sought to permanently enjoin the Authority from interfering with the Club's use and enjoyment of the property and sought consequential damages.

---

1. Pursuant to Section 10 of the Authority's Bylaws, "the act of a majority of the members of the Board of Authority present at any such meeting, at which a quorum is present, shall be regarded as the act of the members of the Board of Authority, in its own capacity...." Club Ex. No. 10; R.R. at 559a.

The Authority filed an answer and new matter denying the Club's material allegations. Authority's new matter included the averment that the lease is invalid because it was not placed before the Board for review, comment and vote. The Authority further averred that the lease was not properly signed and that the lease is invalid because the Board approved it in an *ultra vires* manner.

Following a non-jury trial, the trial court held the lease to be a binding contract. In so doing, the trial court found that at the time the Board majority voted to approve the lease, the contracting parties understood there were no additional conditions precedent to formation of the contract. Tr. Ct. Op. at 4. In particular, the trial court found the Board majority understood that an engineering certificate was not a mandatory condition precedent or a hurdle to contract formation. *Id.* The court also found any discussion at the meeting regarding the need to finalize the contract referred only to having Board Chairman sign the lease. *Id.,* n. 2.

The trial court also rejected the Authority's remaining arguments that a valid contract did not exist. In so doing, it held:

on December 8, 2003, once the majority of the [Board] voted to adopt the Lease Agreement, a meeting of the minds occurred and a valid contract was formed. We further conclude that failure to obtain an engineering certificate was not a bar, nor was it a pre-condition to contract formation. Lastly, we conclude that, in entering into the Lease Agreement with [the Club], the [Authority] was performing a proprietary function, not a governmental function, and, therefore, the [Board] did not act *ultra vires.* Accordingly, [we grant] declaratory relief. (Tr. Ct. Op. at 13.)

The Authority filed a post-trial motion asserting the trial court committed errors of law and abused its discretion inasmuch as its crucial findings were not supported by substantial evidence. The trial court denied the motion, and the Authority appealed.

■ Our review in declaratory judgment and equity actions is limited to determining whether the trial court's findings were supported by substantial evidence and whether the trial court erred as a matter of law or abused its discretion. *Pa. Indep. Waste Haulers Ass'n v. Twp. of Lower Merion,* 872 A.2d 224 (Pa.Cmwlth. 2005); *Millstone Enters., Inc. v. Dep't of Envtl. Res.,* 101 Pa.Cmwlth. 408, 516 A.2d 814 (1986).

## II. Issues

The Authority presents three issues. First, it asserts the trial court erred in failing to find that two mandatory conditions precedent to the lease were not fulfilled. Second, the Authority asserts the Board majority acted in an *ultra vires* manner in approving and executing the lease. The Authority further contends the lease is unenforceable as against public policy. Third, the Authority asserts the trial court erred in determining the Authority's approval of the lease constituted a proprietary rather than governmental function.

## III. Contract Formation; Conditions Precedent

■ The Authority first argues the trial court erred in concluding that at the time the Board approved the lease the parties understood there were no additional conditions precedent to formation of the contract. Rather, the Authority maintains, Resolution 123 did not constitute an acceptance of the Club's lease offer, but rather a counter-offer that included two mandatory conditions precedent. The Au-

thority asserts that no valid contract ever existed.[2]

**■** "[A] condition precedent may be defined as a condition which must occur before a duty to perform arises." *Acme Mkts., Inc. v. Fed. Armored Express, Inc.,* 437 Pa.Super. 41, 648 A.2d 1218, 1220 (1994). "While the parties to a contract need not utilize *any* particular words to create a condition precedent, an act or event designated in a contract will not be construed as constituting one unless that clearly appears to have been the parties' intention." *Id.* "To determine the purpose of the conditions, the general rules of contract interpretation are applied and the intention of the parties is controlling." *Estate of Barilla,* 369 Pa.Super. 213, 535 A.2d 125, 129 (1987).

**■** However, if parties agree upon essential terms and intend them to be binding, a contract is formed, even though they intend to adopt a formal document with additional terms at a later date. *Hartman v. Baker,* 766 A.2d 347 (Pa.Super.2000); *see also* Restatement (Second) of Contracts, § 27 (1981). As a general rule, signatures are not required to create a contract unless such signing is expressly required by law or by intent of the parties. *Hartman.*

First, the Authority contends, Resolution 123 requires two Authority officers sign the lease. Second, the Authority maintains, an engineering certificate is re-

quired by Authority bond documents. The Authority claims it is beyond dispute that these conditions were not met. Therefore, the Authority asserts, the execution of the lease lacked any legal effect. *See Keystone Tech. Group v. Kerr Group,* 824 A.2d 1223 (Pa.Super.2003) (if a contract contains a condition precedent, the condition must be met before a duty to perform the contract arises); *Acme Mkts.* (same).

As to the existence of the alleged conditions precedent, the trial court made the following relevant findings:

10. At the time the [Board majority] voted to approve the Lease Agreement, it was understood by the contracting parties at [the Club] and the [Board majority] that there were no additional conditions precedent to formation of the contract.

11. All of the contracting parties at the Club, as well as those Board members that voted in favor of approving the Lease Agreement understood that an Engineering Certificate was not a precondition to contract formation and was not a hurdle to contract formation.

12. On December 8, 2003, after the meeting of the Board, [Board Chairman] signed the Lease Agreement on behalf of the [Board].[2]

---

2. Additionally, we find that any discussion during the meeting of the Board regarding the need to finalize the Lease Agreement

---

2. "The law of this Commonwealth makes clear that a contract is created where there is mutual assent to the terms of a contract by the parties with the capacity to contract." *Shovel Transfer & Storage, Inc. v. Pa. Liquor Control Bd.,* 559 Pa. 56, 62–63, 739 A.2d 133, 136 (1999). In order for a contract to be formed, there must be an offer, acceptance, and an exchange of consideration. *Jenkins v. County of Schuylkill,* 441 Pa.Super. 642, 658

A.2d 380 (1995). An enforceable agreement exists if the parties have manifested their intent to be bound by its terms and the terms are sufficiently definite. *In re Estate of Hall,* 731 A.2d 617 (Pa.Super.1999). "When the trier of fact has determined the intention of the parties to an agreement, an appellate court will defer to the findings if the evidence supports them." *Id.* at 621.

referred only to having [Board Chairman] sign the Lease Agreement.

Tr. Ct. Op. at 4.

## A. Signatures

 The Authority asserts the executed lease does not bear two officers' signatures required by Resolution 123. Rather, the Authority points out, only Board Chairman signed for the Authority, and he did not indicate his office or capacity. *See* Lease, Club Ex. No. 3; R.R. at 543a. The Authority therefore maintains this mandatory condition was not met.

The Authority's contention lacks merit. Resolution 123 relevantly states: "Be it further resolved, that the appropriate officers are authorized to sign, as such, any and all documents to effectuate the above lease agreement." Club Ex. No. 11; R.R. at 578a. Thus, we note that Resolution 123 does not state the lease is contingent on *two* Authority officers' signatures.

The Board's five members are also the officers who operate the Authority. Board Chairman signed the lease on behalf of the Authority. *Id.;* R.R. at 543a. Club President and Club Secretary signed for the Club.[3] *Id.*

 When contract language is ambiguous and the intention of the parties cannot be ascertained from the writing alone, oral testimony as to the intent of the parties and the circumstances attending the execution of the contract can be considered. *Acme Mkts.* As fact-finder, the trial court is the sole arbiter of the credibility and weight of the evidence. *See*

3. Club Secretary testified the parties signed the lease at Authority Solicitor's office. N.T., 09/22/04 at 96; R.R. at 137a. Although both Club President and Club Secretary signed on behalf of the Club, Authority Solicitor never told them they both needed to sign. *Id.* at 97;

*Commonwealth v. Holtzapfel,* 895 A.2d 1284 (Pa.Cmwlth.2006).

Contrary to the Authority's assertion, the trial court essentially determined the parties intended the lease be memorialized thereafter by a writing bearing Board Chairman's signature. Tr. Ct. Op. at 4, n. 2. This is supported by the record. Board Chairman testified there were several occasions when he signed legal documents such as contracts and leases after Board approval. Notes of Testimony (N.T.), 09/22/06 at 131, 156; R.R. at 172a, 197a. Board Chairman was not aware of any requirement that legal documents be signed by more than one Board member. *Id.* at 131; R.R. at 172a. It was not unusual for only one signature to appear on Board documents. *Id.* at 156; R.R. at 197a. Board Chairman also stated he was unaware of a standard protocol concerning the signing of documents. *Id.* Either Authority Solicitor or Authority Manager prepared the documents. *Id.* Board Chairman signed them at the meetings. *Id.* Board Chairman further stated that, as acting chairman, he signed the lease under the Authority's name. *Id.* at 161; R.R. at 202a.

In addition, there is no evidence the parties intended or understood that Resolution 123 required two Authority officers' signatures for the lease to become enforceable. Moreover, the Authority cites no provision in its bylaws or resolutions indicating two officers' signatures are required to execute a contract. Rather, following the affirmative roll call vote on Resolution 123, Board Chairman believed he, as acting chairman, was authorized to sign the lease.[4] *Id.* at 130–31; R.R. at 171a–72a.

R.R. at 138a. *Id.* Rather, they "figured it was safer to have two on than only one." *Id.*

4. We note, pursuant to Section 7 of the Authority's Bylaws, the Authority's chief executive officer "shall sign, execute and acknowledge, in the name of the Authority, deeds,

In the absence of clear contractual language to the contrary, we discern no error in the trial court's determination, which is supported by the record, that the contracting parties intended the lease be memorialized thereafter in a writing bearing Board Chairman's signature. *Acme Mkts.; Estate of Barilla.*

## B. Engineering Certificate

■ The Authority also contends the trial court erred in not finding Resolution 123 mandated an engineering certificate as a condition precedent to a valid lease. To that end, the Authority asserts, William J. Schumacher, Jr. of Schumacher Engineering, Inc. (Consulting Engineer) did not issue the required engineering certificate as to the usefulness and necessity of the property in its relation to the water system. Rather, Consulting Engineer issued a letter stating that due to a proposed timber harvest on the property, it was not in the Authority's best interest to issue an engineering certificate for the Club's lease. *See* Auth. Ex. 11; R.R. at 637a. The Authority consequently maintains this mandatory condition was not met.

As to this issue, Resolution 123 provides: "That an opinion from the Authority's engineer as to the usefulness and necessity of the property as it relates to the water system be obtained...." Club Ex. No. 11; R.R. at 578a. This language does not indicate that execution of the lease is contingent on the issuance of an engineering certificate. Moreover, as seen from the findings quoted above, the trial court found that an engineering certificate was not a condition precedent to the lease. Tr. Ct. Op. at 4.

This finding is also supported by the record, as all three members of the Board

majority testified they intended the lease to be valid without an engineering certificate as a condition precedent. First, Board Chairman testified, at the time of the Board vote, he did not think an engineering certificate was required as a condition to lease approval. N.T., 9/22/06 at 129; R.R. at 169a. Rather, he believed the lease was valid with or without an engineering certificate. *Id.* at 155–56; R.R. at 196a–97a. Nobody ever advised Board Chairman that engineering certificates were an absolute requirement; they were only used to verify metes and bounds. *Id.* at 146; R.R. at 187a. With the other four hunting club leases, the engineering certificates came after lease approval. *Id.* at 124; R.R. at 165a.

Second, Board Vice Chairman testified he informed Club President the engineering certificate requirement was not part of his motion to grant the lease. N.T., 10/04/06; 43, 53–55; R.R. at 248a, 258a–60a. He motioned to grant the lease without conditions or contingencies. *Id.*

Third, William J. Fay (Board Secretary) testified that he voted to approve not only the Club's lease, but the other four leases as well. *Id.* at 80–81; R.R. at 285a–86a. He recalled that the Board approved the other four leases before engineering certificates were obtained. *Id.* at 81; R.R. at 286a. He also testified that when he voted to approve the Club's lease, he understood that an engineering certificate was not a condition of lease approval. *Id.* at 84–85; R.R. at 289a–90a.

Board Secretary further testified he thought the purpose of the engineering certificate was solely to confirm identification of property lines. *Id.* at 87; R.R. at 292a. Although the Board did not have

mortgages, bonds, contracts or other instruments, authorized by the Board of Authority...." Club Ex. No. 10; R.R. at 561a–62a.

the exact property description at the time of the lease approval vote, Board Secretary was familiar with the property. *Id.* at 87–88; R.R. at 292a–93a.

 The above testimony from the Board majority supports the trial court's finding. As discussed above, an act or event designated in a contract will not be construed as a condition precedent unless that clearly appears to be the parties' intention. *Shovel Transfer & Storage, Inc. v. Pa. Liquor Control Bd.*, 559 Pa. 56, 739 A.2d 133 (1999); *Acme Mkts.; Estate of Barilla.* Here, neither the Club nor the Board majority intended the engineering certificate requirement as a condition precedent to a binding lease.

Nonetheless, the Authority contends the approval of the lease without an engineering certificate would violate the requirements of the Authority's "Pennvest"[5] bond documents. *See* Auth. Ex. No. 10 (Section 9.05 of Trust Indenture); R.R. at 635a–36a. We disagree.

The trial court recognized the Club is not a party to the Authority's Pennvest trust indenture. Tr. Ct. Op. at 4, F.F. No. 13. Moreover, Board Chairman testified the purpose of the engineering certificate was to assure Authority bond holders that the value of the leased property would not be diminished by the hunting club leases. N.T., 09/22/04 at 125–27; R.R. at 166a–68a. Based on responses of a Pennvest attorney, Board Chairman understood that the Authority could enter into hunting club leases without first obtaining an engineering certificate, and that doing so would not violate its trust indenture. *Id.* at 127–28; R.R. at 168a–69a. He received a letter from Pennvest to this effect. *Id.*

In addition, Consulting Engineer stated he did not issue the engineering certificate for the Club lease because, at the time, the Authority and the City of Hazleton were seeking contracts to harvest timber on the subject property. N.T., 10/04/06 at 149–50; R.R. at 354a–55a. However, the timber harvest never took place. *Id.* Nothing in the lease was fatal to the issuance of an engineering certificate. *Id.* at 158; R.R. at 363a.

As reflected by the record, the Board majority did not believe the Pennvest trust indenture required an engineering certificate be obtained before the Authority could enter into a hunting club lease. Consequently, we find no error in the trial court's ruling that an engineering certificate was not a bar or pre-condition to contract formation. *Shovel Transfer & Storage; Acme Mkts.; Estate of Barilla.*[6]

---

5. *See* Pennsylvania Infrastructure Investment Authority Act, Act of March 1, 1988, P.L. 82, *as amended*, 35 P.S. §§ 751.1–751.19. Pursuant to this Act, the Pennsylvania Infrastructure Investment Authority (Pennvest) provides grants and low interest loans for construction and improvement of water systems.

6. Having determined the trial court's finding that a contract was formed at the meeting is supported by competent evidence and is consistent with law, we reject the Authority's argument that Resolution 123 was not an acceptance but was instead a counter-offer. This argument is rejected as inconsistent with the facts as determined by the fact-finder.

We also reject the Authority's assertion a contract could not be formed because the Board did not have an exact description of the property at the time of the approval vote. Resolution 123 provided that the property would be "more particularly" described in the lease. Board Vice Chairman, who moved for the vote on Resolution 123, testified there was a legal description of the property available at the time of the vote. N.T., 10/04/06 at 51. Also, the record reflects that the contracting parties knew the location of the subject property. Moreover, the record does not indicate any disagreement regarding location of the property.

"An agreement is definite if it indicates the parties intended to make a contract and if

## IV. *Ultra Vires* Acts

■ The Authority further claims the Board majority acted in an *ultra vires* manner in approving and executing the lease. "An organization performs an 'ultra vires' act if it performs the act without any authority to do so on a particular subject or if it has the authority to do so but exercises it irregularly." *Chichester Sch. Dist. v. Chichester Educ. Ass'n.*, 750 A.2d 400, 403 (Pa.Cmwlth.2000).

### A. December 8 Meeting

■ First, the Authority asserts the Board majority's actions in approving the lease were *ultra vires* because the Board acted in an irregular or unauthorized manner at the December 8 meeting. In particular, the Board majority suspended the standard rules of operation and voted to approve Resolution 123, which was not on the meeting agenda and not discussed at a prior work session. In addition, the Board did not have the lease document to review at the time of the roll call vote.

In support, the Authority cites General Manager's testimony. He stated work sessions are held a week before Board meetings. N.T., 10/04/06 at 95; R.R. at 300a. Items discussed at the work sessions are then put on the agenda for approval at the regular Board meetings. *Id.* at 96; R.R. at 301a. However, the Board did not review the Club's lease at a work session. Moreover, the document was not finished or available to the Board when it voted to approve the lease. *Id.* at 107; R.R. at 312a.

In discussing whether the Board's actions at its December 8 meeting were *ultra vires*, the trial court stated:

Failure to place the matter on agenda for proper review does not constitute an *ultra vires* action. In fact, it was the testimony of [Board Chairman] that, when the Board wished to consider a matter that wasn't ready at the prior work session, it was the standard practice of the board to "suspend the rules." The general rules of operation followed by the Board ... are powers that the Board clearly had authority to exercise, and presumably, a standard practice is hardly a power exercised irregularly.

It is clear from the evidence, and already a finding of this Court, that there was a meeting of the minds of all parties as to the terms of the Lease Agreement, and the Lease Agreement is a valid contract. It is also clear from a reading of the statutory powers granted to a Municipal Authority that [the Authority] has the authority to enter a Lease Agreement. [53 Pa.C.S. § 5607]. Moreover, we note that the Lease Agreement with [the Club] is the fifth such identical agreement (except for metes and bounds) that was entered into by [the Authority] that year. Engaging in contracts generally, and this Lease Agreement specifically, is hardly a power that the Board could not exercise, nor one exercised irregularly. (Tr. Ct. Op. at 8–9.)

Thus, the trial court determined:

[The Board majority] acted appropriately, and within their authority, when they suspended the rules to entertain Resolution 123, and when the majority

---

there is an appropriate basis upon which a court can fashion a remedy." *Reed v. Pittsburgh Bd. of Pub. Educ.*, 862 A.2d 131, 135 (Pa.Cmwlth.2004) (citation omitted). Where, as here, the record supports the trial court's findings that contractual terms are sufficiently

definite, appellate courts will not disturb them. *See Ingrassia Constr. Co., Inc. v. Walsh*, 337 Pa.Super. 58, 486 A.2d 478 (1984). Moreover, as discussed above, at the time the parties signed the lease, it included exact property descriptions.

of the Board voted to enter into the Lease Agreement with [the Club], and, therefore, the [Board] did not commit any *ultra vires* acts in this regard. (Tr. Ct. Op. at 12; C.L. No. 9.)

The trial court's decision is supported by the record. Board Chairman testified it was common practice for the Board to consider matters not ready by the prior work session by suspending the general rules of operation. He stated, generally, the Board held work sessions before meetings and agendas were presented. N.T., 09/22/06 at 123; R.R. at 164a. However, it was not an uncommon practice at Board meetings to suspend the rules in order to get something not discussed at a work session on the agenda. *Id.* Although not discussed at a work session, the Board members were aware of the Club's proposed lease. *Id.* Board Chairman further testified the description of the property was in the lease when he signed it. *Id.* at 157; R.R. at 198a. This is confirmed by the lease. *See* Club Ex. No. 3; R.R. at 535a–43a.

Additionally, Board Vice Chairman testified Authority Solicitor generally reviews leases with third parties before they are executed. N.T., 10/04/06 at 9; R.R. at 214a. Board Vice Chairman did not ask for a copy of the lease at the December 8 meeting because he previously reviewed the lease, which replicated the format of the previous four hunting club leases executed that year. *Id.* at 41; R.R. at 246a. With the exception of the property description, the Club's lease was identical to the other four hunting club leases. *Id.*

We discern no error in the trial court's determination that the Board did not act in an irregular or *ultra vires* manner in approving and executing the lease. Pursuant to 53 Pa.C.S. § 5607(d)(4), the Authority has the power to lease its property. The full Board voted at a public meeting to approve the lease 3–1–1. A three-member majority is sufficient for official Board action.[7] *See* Authority Bylaws, § 10; Club Ex. No. 10; R.R. at 559a–60a.

## B. Lame Duck Board

■ The Authority also argues the Board's outgoing majority acted in bad faith in approving the lease just weeks before the end of their term. Further, the Authority asserts the Board majority, when it voted to approve the lease, was unaware of the total acreage involved and the exact location of the property, which lies near the water source for 13 municipalities in the Greater Hazleton area. *See Chichester Sch. Dist.* (bad faith "last minute" contracts intended to bind a successor board are an egregious violation of public policy). The Authority further asserts the Board majority's bad faith was reflected in the terms of the lease: 487 acres at one dollar per year for 25 years.

The Authority also relies on our Supreme Court's recent decision in *Program Administration Services, Inc. v. Dauphin County General Authority*, 593 Pa. 184, 928 A.2d 1013 (2007). It cites *dicta* that bad faith holdover contracts approved by an outgoing governing body may be voided by the successor body notwithstanding the fact the contracts were statutorily authorized.

The Authority maintains the lease here is the precise type of conduct contemplated by the Supreme Court in *Program*

---

7. The Authority points out neither Board Secretary nor any other Board officer attested to Board Chairman's signature on the lease. However, the lease was signed at Authority Solicitor's office. The document indicates all signatures were attested by Denise Kapes, one of Authority Solicitor's secretaries. As such, we reject the assertion that Board Secretary's failure to witness Board Chairman's signature renders the lease invalid.

*Administration Services.* To that end, the Authority also cites *State Street Bank & Trust Co. v. Treasury Department,* 712 A.2d 811 (Pa.Cmwlth.1998) (last minute contracts by a public official intended to bind a successor to long-term contracts are a particularly egregious violation of public policy).

■ In rejecting these arguments, the trial court properly determined the Authority performed a proprietary rather than a governmental function. Tr. Ct. Op. at 12–13, C.L. No. 10. "Municipal authorities, by their very definition, engage in proprietary functions only." *Boyle v. Mun. Auth. of Westmoreland County,* 796 A.2d 389, 393 (Pa.Cmwlth.2002). Contracts related to proprietary functions can bind successor boards. *Id. Contrast State Street Bank* (outgoing state treasurer's custodial and securities lending agreements with a private bank related to the office's governmental powers and thus cannot bind a successor treasurer).

Moreover, the record does not support the Authority's assertions of bad faith. The Authority entered into the lease to prevent the occurrence of damaging activities such as the unauthorized use of motor vehicles, drinking parties and random target shooting. Tr. Ct. Op. at 2; F.F. No. 4. To that end, the Club's members are local individuals who exercise stewardship over the leased property, monitor activities on it, and maintain liability insurance on it. In other words, the Club provided consideration to the Authority for the lease beyond the nominal rent. As such, the Club's lease is not the type of "bad faith" holdover contract the *Program Administration Services dicta* envisioned as voidable.

■ "[S]ubsequent boards are bound by contracts validly made by former board members and cannot 'undo what the former Board had legally done.'" *Chichester*

*Sch. Dist.,* 750 A.2d at 403–04 (citation omitted). Such is the case here. Therefore, we reject the Authority's contention that the lease is *ultra vires* and therefore not binding on the current Board.

## V. Governmental Functions Analysis

### A. Argument

The Authority maintains the trial court erred in determining the Authority's lease approval constituted a proprietary rather than a governmental function. It asserts the trial court misapplied the governmental functions test. Assuming a contract exists, the Authority contends, it performed a governmental rather than a proprietary function when it approved the lease.

In support, the Authority cites Sections 5607 and 5620 of the Municipal Authorities Act, 53 Pa.C.S. §§ 5607, 5620. Pursuant to 53 Pa.C.S. § 5607(d)(4) (emphasis added), the Authority may exercise all powers necessary to:

> acquire, purchase, hold, *lease* as lessee and use any franchise, property, real, personal, or mixed, tangible or intangible, or any interest therein necessary or desirable for carrying out the purposes of the authority, and to sell, *lease* as lessor, transfer and dispose of any property or interest therein at any time acquired by it.

Claiming its leasing activities constitute a governmental function, the Authority cites 53 Pa.C.S. § 5620, titled, "**Exemption from taxation and real estate taxes,**" which provides in part (with emphasis added):

> The effectuation of the authorized purposes of authorities created under [the Municipal Authorities Act] shall be for the benefit of the people of this Commonwealth, for the increase of their

commerce and prosperity and for the improvement of their health and living conditions. *Since authorities will be performing essential governmental functions in effectuating these purposes,* authorities shall not be required to pay taxes or assessments upon property acquired or used by them for such purposes. . . .

The Authority argues its power to lease its property under 53 Pa.C.S. § 5607(d)(4) comes within the above-quoted scope of essential governmental functions.

Further, the Authority, citing a number of cases, acknowledges the well established three-factor governmental functions test. *See County of Butler v. Local 585, Serv. Employees Int'l Union,* 158 Pa.Cmwlth. 519, 631 A.2d 1389 (1993); *Assoc. Pa. Constructors v. City of Pittsburgh,* 134 Pa. Cmwlth. 536, 579 A.2d 461 (1990). In *Associated Pennsylvania Constructors,* we recognized a proprietary function is one that the local governmental unit is not required to perform, may be carried on by private enterprise, or is used as a means of raising revenue.

However, the Authority argues it is time to abandon the governmental functions test in municipal contract cases. Noting the test's origins in governmental immunity cases (municipality immune from liability on the basis it was performing a governmental rather than a proprietary function), the Authority argues there is little or no judicial reasoning in those decisions as to why the governmental functions test should be used as a foundation for determining proprietary versus governmental functions. *See Morris v. Sch. Dist. of Twp. of Mt. Lebanon,* 393 Pa. 633, 144 A.2d 737 (1958), *overruled by Ayala v. Phila. Bd. of Pub. Educ.,* 453 Pa. 584, 305 A.2d 877 (1973); *Hill v. Hous. Auth. of City of Allentown,* 373 Pa. 92, 95 A.2d 519 (1953).

Alternatively, even assuming the governmental functions test applies, the Authority argues its leasing of a watershed area is an activity that a private enterprise cannot perform. The Authority thus contends approval of the lease here constitutes a governmental rather than proprietary function.

The Club responds, it is well established that a municipal authority which owns and operates a water system, acts in a proprietary rather than a governmental capacity. *Boyle; Yezioro v. N. Fayette County Mun. Auth.,* 193 Pa.Super. 271, 164 A.2d 129 (1960).

## B. Discussion

First, the Authority's argument that 53 Pa.C.S. § 5620 identifies all acts of municipal authorities as essential governmental functions, lacks merit. As we explained in *Boyle,* "[g]enerally, authorities are established for the purpose of financing and managing revenue producing projects of a public nature or other activities that are not considered to be part of core governmental activities; they are a government business venture, a form of quasi-privatization." *Boyle,* 796 A.2d at 393 (citation omitted). Consequently, a "municipal authority owning or operating a water system acts in a proprietary rather than a governmental capacity." *Id.* at 393–94 (citation omitted).

Second, our appellate courts consistently hold that a municipal authority's acts constitute proprietary, not governmental functions. *Mun. Auth. of Borough of Edgeworth v. Borough of Ambridge Water Auth.,* 936 A.2d 538 (Pa.Cmwlth.2007); *Boyle.*

"Whether a governmental body may enter long-term contracts binding upon it successors turns on whether the contract serves a governmental or proprie-

tary purpose." *Borough of Ambridge Water Auth.*, 936 A.2d at 548. "If the contract relates to a governmental function, it cannot bind successors; however, if the contract relates to a proprietary function, it can bind successors." *Id.*

■ "In determining whether activity is governmental or proprietary, the court will consider whether: (1) the activity is one that government is not statutorily required to perform; (2) the activity also may be carried on by private enterprise; or (3) the activity is used as a means of raising revenue." *Id.* "If the answer to any of these inquiries is yes, the function is proprietary." *Id.*

■ Here, the Authority is statutorily authorized to lease its property, but not statutorily required to do so. Therefore, the trial court did not err in holding the lease approval constituted a proprietary function. *Ambridge Water Auth.; Boyle.*

■ Additionally, we find guidance in the Supreme Court's rationale in *Program Administrative Services.* Regardless of whether the governing body is performing a governmental or proprietary function, the existence of statutory authorization for the lease embodies a legislative policy decision favoring predictability, stability and certainty with regard to some range of matters connected with acquisition and disposition of property owned by municipal authorities. *Id.* Inasmuch as it is the function of the General Assembly to determine public policy, the General Assembly's policy choices, as reflected by the statutes, prevail over the common law-based distinction between governmental and proprietary functions. *Id.*

For the above reasons, we hold the trial court did not err in determining the Authority's lease approval constituted a proprietary function rather than a governmental function.

Discerning no error in the trial court's decision, we affirm.

### ORDER

AND NOW, this 20th day of February, 2008, the order of the Court of Common Pleas of Carbon County is **AFFIRMED.**

DISSENTING OPINION BY Judge SMITH–RIBNER.

I cannot join in the majority's decision to affirm the order of the Court of Common Pleas of Carbon County in this declaratory judgment action instituted by the Beaver Dam Outdoors Club (Club) against the Hazleton City Authority (Authority) because the lease agreement executed on December 8, 2003 between the Club and the Authority is not a valid and binding contract. Authority Board Resolution 123, approved at a December 8, 2003 Board meeting after suspension of Board rules, contained mandatory conditions precedent to the formation of a contract between the parties, which were not met. Resolution 123 reads:

> Be it Resolved by [the Board] that a Lease be entered into between [the Authority and the Club] for the purpose of leasing a parcel or tract of land situated in Packer Township, Carbon County as more particularly described in said Lease Agreement. Be it further resolved, that the appropriate officers are authorized to sign, as such, any and all documents to effectuate the above lease agreement. That an opinion from the Authority's engineer as to the usefulness and necessity of the property as it relates to the water system be obtained and notice of the lease agreement be forwarded to all parties of interest by the Solicitor.

The mandatory conditions precedent to the Authority entering into the 25–year

lease with the Club of 415.188 acres of Authority property at $1 per year provided that (1) the appropriate officers of the Authority were to sign documents necessary to effectuate the lease agreement and that (2) a certificate be obtained from the Authority's engineer regarding the usefulness and necessity of the lease as it pertained to the Authority's operation of its water system. The lease agreement was not signed by the "appropriate officers" of the Authority: rather, it was signed on December 8, 2003 only by Board Chairman DeAndrea, whose term as a Board member was set to expire on December 31, 2003. There is no dispute that neither Board Secretary Fay nor any officer other than the Chairman signed the document. Additionally, no certificate was issued by the Authority's consulting engineer (Mr. Schumacher). *Contrast, however,* Board Resolutions/Consulting Engineer's Certificates/Authority Agreements included in the Reproduced Record (R.R.) at 594a–625a. The record shows that on April 12, 2004 the consulting engineer refused to issue a certificate for the lease for the best interest of the Authority "[d]ue to the proposed timber harvest on lands of the Hazleton City." R.R. at 637a.

Mr. Schumacher had been asked to review the process for issuing a consulting engineer's certificate for the Authority upwards of 40 times during his more than 20 years of service as the Authority's consulting engineer. R.R. at 146–147. He did not issue one for the subject lease. *Id.* The Club's president (Mr. Sherkness) understood that an engineer's certificate was part of the process but stated that he did not think the Club was required to obtain the certificate. R.R. at 88a–92a. Despite the unequivocal language of Resolution 123, the uncertainty expressed by the trial court regarding the Club president's testimony related to the engineering certificate and other relevant evidence, the trial court

nevertheless found that the Club and a majority of the Authority Board members understood that there were no additional conditions precedent to forming a contract and that an engineering certificate was not a precondition, or hurdle, to formation of the contract. The trial court found, as well, that discussions regarding finalization of the lease referred only to having the Board Chairman execute the lease agreement.

The language in Resolution 123 is unequivocal, and the trial court erred in failing to find that a valid contract did not exist between the parties because the mandatory conditions precedent to formation of a lease agreement were not satisfied. I note that the trial court failed to discuss the law with respect to the failure of meeting conditions precedent to a contract and that it summarily concluded that failure to obtain the engineering certificate was not a bar or a pre-condition. In *Acme Markets, Inc. v. Federal Armored Express, Inc.*, 437 Pa.Super. 41, 648 A.2d 1218 (1994), the court indicated that a condition precedent to formation of a contract may be defined as a condition that must occur before any duty arises between the parties to perform under the contract. Further, in *Village Beer and Beverage, Inc. v. Vernon D. Cox and Co., Inc.*, 327 Pa.Super. 99, 475 A.2d 117 (1984), the court discussed the nature of a condition precedent (as well as that of a condition subsequent) and reiterated the principle that the intent of the parties is paramount in construing a contract and that a court will adopt an interpretation that, under the circumstances, "ascribes the most reasonable, probable, and natural conduct of the parties, bearing in mind the objects manifestly to be accomplished." *Id.* at 121. The trial court in the case *sub judice* failed to adopt the proper interpretation of the parties' conduct and in the process committed an

error of law when it held that the lease agreement was valid and enforceable. Its order should be reversed.